[No. B213415. Second Dist., Div. Two. Jan. 18, 2011.]

NORTEL NETWORKS INC., Plaintiff and Appellant, v.
BOARD OF EQUALIZATION, Defendant and Appellant.

1260

## Counsel

Paul, Hastings, Janofsky & Walker, Jeffrey G. Varga, Julian B. Decyk, Paul W. Cane and Peter J. Wied for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, W. Dean Freeman, Felix E. Leatherwood and Stephen Lew, Deputy Attorneys General, for Defendant and Appellant.

## Opinion

**BOREN, P. J.**—This appeal requires an interpretation of the Sales and Use Tax Law. (Rev. & Tax. Code, § 6001 et seq.)[1] Nortel Networks Inc. sells telephone switching equipment in California. Income from switch *hardware* sales is indisputably taxable by the State of California. The question is whether sales tax is imposed on the *software* that Nortel licenses to operate the switching equipment. The Board of Equalization (the Board) determined that Nortel owed sales tax on software it licensed between January 1994 and December 1997. Nortel paid the tax then sued for a refund.

We conclude that the software licensed by Nortel is exempt from sales tax under the technology transfer agreement (TTA) statutes because it (1) is copyrighted, (2) contains patented processes, and (3) enables the licensee to copy the software, and to make and sell products—telephone calls—embodying the patents and copyright. (§§ 6011, subd. (c)(10)(D), 6012, subd. (c)(10)(D).) The Board's attempt to limit the scope of the TTA statutes by excluding prewritten computer programs is an invalid exercise of its regulatory power. The TTA statutes encompass "any" transfer of an interest subject to a patent or copyright, which includes prewritten programs licensed by Nortel.

---

[1] All undesignated statutory references in this opinion are to the Revenue and Taxation Code. All references to state regulations are from the California Code of Regulations, title 18, and are referred to as "regulation."

# FACTS[2]

## *Nortel Designs, Manufactures and Sells Switch Hardware*

Nortel manufactured and sold switches to Pacific Bell Telephone Company. Each switch processes telephone calls, and handles features such as conference calling, call waiting, and voice mail. A switch is hardware, comprised of computer processors, frames, shelves, drawers, circuit packs, cables, and trunks. A "line card" for each Pacific Bell customer is contained within the switch. The line card is attached to cables that eventually connect to a subscriber's home or business. When the subscriber picks up the telephone to make a call, the audible dial tone is generated by the computer in the switch.

Pacific Bell houses its switches in California at over 200 buildings or central offices. A switch for a dense urban area such as downtown Los Angeles is large enough to fill a bowling alley or small auditorium. Each location requires different equipment. Nortel's engineers inspect the site where the switch is to be located and write hardware specifications in order to design and build a new switch.[3]

## *Nortel Licenses Software Programs for the Switches*

Nortel and Pacific Bell entered licensing agreements giving Pacific Bell the right to use Nortel's software programs in the switches. There are two types of licensed software. First, there are prewritten operator workstation programs (that connect customers to operators), data center programs (that connect customers to directory assistance), and switch-connection programs (that allow switches to communicate). Second, there are switch-specific programs (SSP's) that operate the switch and enable it to process telephone calls. Each SSP is unique, is created for a particular switch, and cannot be used to operate any other switch.

Owing to their uniqueness, SSP's are "never" offered for general sale, or for repeated sale or lease. Instead, they are "created on an as-needed basis." The Board agrees that each switch and each program to operate a switch is "unique."

---

[2] Owing to state budgetary problems, the sole expert witness designated by the state refused to be deposed because his fee was unpaid. As a result, he was not permitted to testify at trial, a lapse the trial court aptly forecast as "fatal" to the state's defense. Nortel was the beneficiary of the state's fiscal distress: to make its factual findings, the trial court had to rely exclusively on technical testimony from a procession of Nortel-friendly witnesses. The court found the testimony "credible in all respects," based on the witnesses' candor and demeanor.

[3] Nortel has competitors for this business, such as Lucent, Siemens, Erickson, Fujitsu and Cisco.

Nortel copyrights its SSP's: each program is "an original work of authorship created by the Nortel software programmers." The SSP itself incorporates one or more processes that are subject to—and implement—Nortel's patent interests. Nortel holds between 200 and 500 patents on inventions related to switches. For example, one patented invention melds caller identification with call waiting, enabling a person who is already on the telephone to view the name or telephone number of an incoming caller.

Nortel's licensing agreements forbid Pacific Bell from giving a copy of the SSP to third parties. Although Pacific Bell could theoretically sell the switch hardware to another company without the SSP, "the hardware is of no use to anybody without the software running on it." If Pacific Bell wanted to use a different vendor at the end of the licensing period, it would have to tear out all of Nortel's hardware, then install new hardware and software.

## The Creation of an SSP

The foundation for Nortel's SSP's is a basic code, a component of the software for every switch. The basic code has been in use for at least three decades, and is still being developed. It is "a starting point or subset of instructions necessary to operate a specific switch." The basic code itself cannot operate a switch or process a telephone call. Nortel takes portions of the basic code and merges it into translations, parameters and instructions designed specifically for a given installation, resulting in an SSP. The newly created SSP operates the switch, enabling it to process telephone calls and operate features.

The available basic code is a "library" of information so large that, if printed out, it would fill several warehouses. It encompasses various geographic areas, such as North America, Central America, and Europe. Within a geographic area, there are customers like Pacific Bell that want local calling capability, while a company such as AT&T would want only long distance capability. The basic code is "never" available for general sale or lease. Nortel did not license to Pacific Bell the right to use the basic code.

Nortel's marketing materials suggest that there is no need to refine switch software because purchasers can selectively activate the basic code features that they wish to use. Despite the marketing language, Nortel's sophisticated telecommunications customers understand that the basic code will not operate a switch without the addition of instructions derived from translations, parameters, and hardware specifications. Without this additional information, the switch cannot process telephone calls or operate features. In short, the basic code—without more—is incomplete and unusable.

To create a switch, Nortel extracts from the basic code information pertaining to the customer's geographic area, and the type of telecommunications service the customer will provide (local versus long distance). The basic code has evolved over the years, and newer versions of the basic code contain new features. Common "features" include call waiting, caller identification, call forwarding, voice mail and music-on-hold. "Parameters" refers to information used to determine the amount of memory needed, software resources, and the timing of events and optional features. Parameters vary depending on population size and the type of subscriber, whether business or residential, rural or suburban. Approximately 300 to 400 parameters are used for an SSP.

Translations for each switch are determined by physical location, area code, and the range of telephone numbers the switch will serve. For example, if a residential subscriber in Los Angeles dials a number in North Carolina, the switch translates the call as nonlocal and routes it to another switch that will send the call out of state and determine how the call needs to be billed to the subscriber. Additional instructions are needed when creating an SSP to ensure that calls are made in the manner prescribed by California's Public Utilities Commission; for example, the commission dictates whether the area code must be dialed when making a local call, or just the seven-digit phone number.

Creating a new SSP for a Pacific Bell location, using the basic code as a foundation, requires some 400 hours of work. A Nortel expert stated that "there's thousands and thousands of pieces of information you have to put in there." Another expert described the work as "lots of programming."

At the outset of the project, a Nortel applications engineer obtains from the customer information regarding the type and quantity of equipment for a new switch, as well as the projected population growth of the area served, and develops hardware specifications. A Nortel software systems engineer obtains from the customer information regarding switch-specific parameters. Without this information, Nortel cannot create a new SSP. The Nortel software engineer enters the customer data into "tools." Tools are not part of the basic code. Rather, they are prewritten computer programs used by Nortel to create SSP's. Through "significant processing," the tools integrate the basic code with the customer's specifications, developing a new code and generating an SSP. To expand the capabilities of an existing switch, or upgrade the switch to software with more features, Nortel must create a new SSP.

### Pacific Bell's Use of the Software

The completed SSP is shipped to Pacific Bell on disks, magnetic tapes, or cartridges, also known as "storage media." Nortel also provides Pacific Bell

with the three prewritten programs—the data center program, the operator workstation program, and the switch-connection program. The cost of producing the storage media is negligible—$54,604—and the licensing agreements do not separately state a price for the storage media. The licensing agreements allow Pacific Bell to copy the software from the storage media and load it into the operating memory of a switch's computer hardware. This authorization to copy the software onto its computers allows Pacific Bell to use the programs without violating Nortel's copyright. Nortel's experts testified that the licensing agreements between Nortel and Pacific Bell are TTA's. Nortel licensed the copyrighted SSP's to Pacific Bell for $401,990,030.12. The license gives Pacific Bell the right to produce telephonic communications, without fear of infringing upon Nortel's patents.

### *The Sales Tax Refund Proceeding*

In 2001, the Board determined that Nortel owed sales tax on its transactions with Pacific Bell. As a result of this determination, Nortel paid sales tax of $32,054,936.62, but no interest. Of this amount, $29.7 million is tax attributable to the SSP's, and $2.3 million is tax attributable to the prewritten operator workstation, data center, and switch-connection programs. Nortel exhausted its administrative remedies with the Board, then instituted this lawsuit seeking a tax refund. The Board filed a cross-complaint seeking unpaid interest from Nortel.

A bench trial was conducted in April and May 2008. The trial court concluded that the licensing fees for SSP's are not subject to taxation, though the amount Nortel charged for use of the prewritten programs is taxable. The court entered judgment for Nortel for $29,719,048.76, plus interest and costs. The parties stipulate that the interest due is $13,360,926.53, and the costs are $89,639.47. The court dismissed the Board's cross-complaint against Nortel for unpaid interest.

### DISCUSSION

The Board appeals from the judgment, challenging the court's decision to refund the sales tax paid by Nortel for licensing the SSP's. Nortel is pursuing a cross-appeal challenging the validity of the Board's administrative regulation and the court's refusal to exempt sales tax paid on prewritten programs, based on the regulation. Our interpretation of statutes and regulations is de novo, but factual determinations made by the trial court will not be disturbed if they are supported by substantial evidence. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1032 [56 Cal.Rptr.3d 814, 155 P.3d 226]; *20th Century Ins. Co. v. Garamendi* (1994) 8

Cal.4th 216, 271 [32 Cal.Rptr.2d 807, 878 P.2d 566]; *As You Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 447–448 [37 Cal.Rptr.3d 399].)

1. *Overview of the Taxation Scheme*

 a. *Tangible Versus Intangible Personal Property*

■ A tax is imposed on all retailers who sell or lease "tangible personal property" in this state. (§ 6051.) Tangible personal property "may be seen, weighed, measured, felt, or touched"; i.e., is "perceptible to the senses." (§ 6016.) A sale is "[a]ny transfer of title or possession, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration." (§ 6006, subd. (a).) ■ Any lease of tangible personal property for a consideration creates a taxable transfer. (§ 6006, subd. (g); *Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197, 211 [105 Cal.Rptr.2d 407, 19 P.3d 1148] (*Preston*).) A "lease" includes a license. (§ 6006.3.)

■ By contrast, a transfer of "intangible personal property is not subject to sales tax." (*Preston, supra*, 25 Cal.4th at p. 208.) ■ Intangible property " 'is generally defined as property that is a "right" rather than a physical object.' " (*Ibid.*) Intellectual property is an intangible right "existing separately from the physical medium that embodies it." (*Simplicity Pattern Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 900, 906 [167 Cal.Rptr. 366, 615 P.2d 555].) Intangible property includes a license to use information under a copyright or patent. (*Preston, supra*, 25 Cal.4th at pp. 216–219.)

 b. *The Technology Transfer Agreement Statutes*

In 1993, the Legislature enacted the TTA statutory provisions relating to the transfer of intellectual property. A TTA is broadly defined as "*any* agreement under which a person who holds a patent or copyright interest assigns or licenses to another person the right to make and sell a product or to use a process that is subject to the patent or copyright interest." (§§ 6011, subd. (c)(10)(D), 6012, subd. (c)(10)(D), italics added; see *Preston, supra*, 25 Cal.4th at p. 215 [TTA is "broadly defined"].) The TTA provisions exempt from taxation "[t]he amount charged for intangible personal property transferred with tangible personal property in any technology transfer agreement, if the technology transfer agreement separately states a reasonable price for the tangible personal property." (§§ 6011, subd. (c)(10)(A) [defining "sales price" in use tax transactions], 6012, subd. (c)(10)(A) [defining "gross receipts" in sales tax transactions].)

The Legislature enacted the TTA statutes over the Board's objections. The Board warned the Legislature that the language covering licenses to "use a

process" could mean the right to use a computer program; this interpretation would exempt software licensing agreements that limit the buyer to conditional use of the program. This, in turn, would reduce state tax revenues. Despite the Board's concerns, the Legislature enacted the TTA provisions with the language to which the Board objected.

c. *Regulation 1507*

Regulation 1507, subdivision (a)(1) defines a TTA as "an agreement evidenced by a writing (e.g., invoice, purchase order, contract, etc.) that assigns or licenses a copyright interest in tangible personal property for the purpose of reproducing and selling other property subject to the copyright interest. A technology transfer agreement also means a written agreement that assigns or licenses a patent interest for the right to manufacture and sell property subject to the patent interest, or a written agreement that assigns or licenses the right to use a process subject to a patent interest."

Regulation 1507, subdivision (a)(1) also defines what a TTA *is not*. "A technology transfer agreement does not mean an agreement for the transfer of any tangible personal property manufactured pursuant to a technology transfer agreement, nor an agreement for the transfer of any property derived, created, manufactured, or otherwise processed by property manufactured pursuant to [a] technology transfer agreement. A technology transfer agreement also does not mean an agreement for the transfer of prewritten software as defined in subdivision (b) of Regulation 1502, Computers, Programs, and Data Processing." A prewritten program is one "held or existing for general or repeated sale or lease. The term also includes a program developed for in-house use which is subsequently offered for sale or lease as a product." (Reg. 1502, subd. (b)(9).)

2. *Section 6010.9 Does Not Apply to the SSP Licensed by Nortel*

 The Sales and Use Tax Law excludes from taxation "the design, development, writing, translation, fabrication, lease, or transfer for a consideration of title or possession, of a custom computer program . . . ." (§ 6010.9.)[4] Section 6010.9 stands for the rule that the *service* of creating

---

[4] A custom computer program is one "prepared to the special order of the customer and includes those services represented by separately stated charges for modifications to an existing prewritten program which are prepared to the special order of the customer. The term does not include a 'canned' or prewritten computer program which is held or existing for general or repeated sale or lease, even if the prewritten or 'canned' program was initially developed on a custom basis or for in-house use. Modification to an existing prewritten program to meet the customer's needs is custom computer programming only to the extent of the modification." (§ 6010.9, subd. (d); see reg. 1502, subd. (b)(4), (9), (10).)

custom software is not taxable, because charges for *services* are generally not subject to sales tax. " 'In the enactment of section 6010.9 the Legislature has recognized that the design, development or creation of a custom computer program to the special order of a customer is primarily a service transaction and, for that reason, not subject to sales tax.' " (*Navistar Internat. Transportation Corp. v. State Bd. of Equalization* (1994) 8 Cal.4th 868, 881 [35 Cal.Rptr.2d 651, 884 P.2d 108].)

Nortel does not claim that it created a custom computer program for Pacific Bell. The Board willingly agrees that Nortel did not provide Pacific Bell with the (nontaxable) service of designing or creating a custom computer program. Instead, the Board argues that Nortel provided a " 'canned' or prewritten computer program which is held or existing for general or repeated sale or lease." (§ 6010.9, subd. (d); see reg. 1502, subds. (b)(9), (f)(1).) In the Board's view, because the program—which it identifies as Nortel's basic code—is canned or prewritten, the licensing of that program to Pacific Bell is taxable.

A computer program "means the complete plan for the solution of a problem, such as the complete sequence of automatic data-processing equipment instructions necessary to solve a problem and includes both systems and application programs and subdivisions, such as assemblers, compilers, routines, generators, and utility programs." (§ 6010.9, subd. (c).) The unrefuted evidence from Nortel's experts showed that the basic code is not a computer program within the meaning of section 6010.9. The testimony showed that the basic code is not "the complete plan for the solution of a problem" because it cannot operate the switch hardware or process telephone calls.[5] Repeated testimony from the witnesses indicated that the basic code, by itself, is vast, unusable and "essentially inoperative." The Board concedes that the basic code by itself cannot operate a switch. No customer, such as Pacific Bell, could expect to purchase or lease a copy of the basic code "off the shelf," load it onto a switch, and use it. For this reason, the basic code has never been available for general, off-the-shelf sale to customers.

Substantial evidence supports the trial court's findings that the basic code is not a computer program because it is not "the complete plan for the solution of a problem." The "problem" in this instance, is to operate a switch, process telephone calls and provide desired features. The basic code cannot operate a switch, process telephone calls or operate features. Although the basic code has assemblers, compilers, routines, generators and utility programs, none of these—individually or collectively—are a complete sequence

---

[5] See footnote 2, *ante.* None of the testimony from plaintiff's witnesses was refuted. The Board had no expert witness testify that the basic code is a computer program or the complete solution of a problem.

of instructions for making a telephone call. To solve the problem of making a call, Nortel extracts applicable portions of the basic code (in this case, the portion covering North America). It applies 400 hours of programming labor to merge the basic code with site-specific information, and creates an SSP.

The SSP is the complete plan for the solution of the problem of processing telephone calls. The Board characterizes the 400 hours of work to create an SSP as "de minimis" relative to the decades needed to develop the basic code. The statute does not make a program any less of a "complete plan" simply because it requires 400 hours of programming instead of years. The trial court found that the 400 hours "represent a substantial amount of work," a factual finding we cannot disturb.

Contrary to the Board's position, Nortel did not license the basic code to Pacific Bell. Nortel charged $400 million to license the *usable* SSP, not the unusable basic code. It is undisputed that each SSP is "unique" to its location. Any attempt to use an SSP at a different location on other computer hardware would fail. As a result, the SSP's cannot be held "for general or repeated sale or lease" under section 6010.9.

After the trial court gave judgment to Nortel, the Board rewrote regulation 1502, subdivision (b)(10), a very tardy "Hail Mary" pass after the last whistle blew and the fans were filing toward the exits. At the time of trial, the regulation did not say what a "problem" is in its definition of a computer program: it simply echoed the statutory language stating that a program is "the complete plan for the solution of a problem." (§ 6010.9, subd. (c).) On May 12, 2009, one year after the trial in this case, the Board approved new language describing what constitutes a "problem."[6]

■ The Board asks this court to apply the newly rewritten regulation and reverse the trial court. The Board cannot win on appeal by belatedly describing a "problem" in the phrase "complete plan for the solution of a problem." Not only must a program be a complete plan for the solution of a problem, but it also must be held for "general or repeated sale or lease." (§ 6010.9, subd. (d); reg. 1502, subd. (b)(9).) The evidence shows that the second part of the equation was unmet. Numerous witnesses testified that the

---

[6] " 'Problem' means and includes any problem that may be addressed or resolved by a program or subdivision; and the 'problem' addressed need not constitute the full array of a purchaser's or user's problems, requirements, and desired features. 'Problem' further includes, without limitation, any problem associated with: information processing; the manipulation or storage of data; the input or output of data; the transfer of data or programs, including subdivisions; the translation of programs, including subdivisions, into machine code; defining procedures, functions, or routines; executing programs or subdivisions that may be invoked within a program; and the control of equipment, mechanisms, or special purpose hardware." (Reg. 1502, subd. (b)(10).)

basic code is *never* held for general or repeated sale or lease. And, as the Board concedes, each SSP is "unique," so an SSP can only be used in a specific location and cannot be resold or leased to others for use elsewhere. Absent any countervailing evidence, we must accept the trial court's finding that neither the basic code nor the SSP's were held for general or repeated sale or lease.

### 3. *Application of the TTA Statutes*

■ The TTA statutes apply when " 'the transfer of patents and copyrights' " is at issue. (*Preston, supra,* 25 Cal.4th at p. 220.) The statutes "unambiguously establish that the value of a patent or copyright interest transferred pursuant to a technology transfer agreement is *not* subject to sales tax even if the agreement also transfers tangible personal property. The lone trigger for this exemption is the presence of a technology transfer agreement. In other words, these provisions exclude the value of a patent or copyright interest from taxation whenever a person who owns a patent or copyright transfers that patent or copyright to another person so the latter person can make and sell a product embodying that patent or copyright." (*Id.* at pp. 213–214.)

■ A licensing agreement is exempt from sales tax if it is a TTA. An agreement is a TTA if (1) the holder of a patent or copyright assigns or licenses to another person "the right to make and sell a product" that is subject to the patent or copyright interest, or (2) the holder of a patent assigns or licenses "a process" that is subject to the patent. (§§ 6011, subd. (c)(10)(D), 6012, subd. (c)(10)(D).) A product is subject to a copyright interest when it "is a copy of the protected expression or incorporates a copy of the protected expression." (*Preston, supra,* 25 Cal.4th at p. 215.) A *copyright*, in other words, confers only " ' "the sole right of multiplying copies." ' " (*Id.* at p. 216.) A license of a *patent* interest, by contrast, "gives the licensee the right to make a product or to use a process." (*Ibid.*)

As the Board observes in its brief, "The series of sequences and steps (e.g., process) carried out by computer software [is] expressed in a form that is considered to be a literary work that is subject to copyright protection." Copyright protection extends to computer programs (*Apple Computer, Inc. v. Formula Internat. Inc.* (9th Cir. 1984) 725 F.2d 521, 523–525), and the Board admits that Nortel had copyright interests in its SSP's. A copyright and a patent can exist concurrently in an intellectual property case. "Neither the Copyright Statute nor any other says that because a thing is patentable it may not be copyrighted." (*Mazer v. Stein* (1954) 347 U.S. 201, 217 [98 L.Ed. 630, 74 S.Ct. 460]; see also *Kewanee Oil Co. v. Bicron Corp.* (1974) 416 U.S. 470,

484 [40 L.Ed.2d 315, 94 S.Ct. 1879] ["the patent policy of encouraging invention is not disturbed by the existence of another form of incentive to invention"].)

The trial testimony showed that the SSP's implemented processes that are subject to Nortel's patents. Further, the SSP's are copyrighted. Nortel licensed the copyrighted SSP's containing patented inventions to Pacific Bell. Nortel's expert described the software licenses as "a bundle of intellectual property rights." In turn, Pacific Bell used the patented processes contained in the SSP's to create and sell a product; namely, telephone communications for consumers. The "products" cited in the testimony include basic and long distance telephone calls; call forwarding; caller identification; call waiting; conference calling; music-on-hold; and voice mail.

■ The Board challenges the idea that creating telephone calls and providing telephonic features is a "product." At trial the state did not call any witnesses (see fn. 2, *ante*), so there was no testimony refuting Nortel's experts, who testified that telephone companies provide a "product" to their customers. Out-of-state authority supports the testimony. The Missouri Supreme Court wrote that "telephone services constitute the 'manufacturing' of 'products' " for the purpose of sales and use tax exemptions. (*Southwestern Bell Telephone v. Director of Revenue*. (Mo. 2002) 78 S.W.3d 763, 764.) The court observed that the human voice "is unsuitable for communication that must occur over any appreciable distance. It cannot be heard from residence to residence, from office to office, or from town to town. The listener requires that the voice be 'manufactured' into electronic impulses that can be transmitted and reproduced into an understandable replica. The end 'product' is not the same human voice, but a complete reproduction of it, with new value to a listener who could not otherwise hear or understand it." (*Id*. at p. 768.) The Minnesota Supreme Court reached a similar conclusion in *Sprint v. Commissioner of Revenue* (Minn. 2004) 676 N.W.2d 656, 657, 663. Thus, telecommunications equipment manufactures "a product" that is ultimately sold at retail, and sales tax is imposed at the point of delivery to customers. (*Id*. at p. 664.)

■ The licensing agreements allow Pacific Bell to copy the SSP from a storage medium such as a disk onto the hard drive of its switching equipment, without violating Nortel's copyright. The owner of a copyright is authorized "to reproduce the copyrighted work in copies . . . ." (17 U.S.C. § 106(1).) Transferring the right to reproduce the copyrighted work is a TTA. (*Preston, supra*, 25 Cal.4th at p. 214.) Even if the scope of the license is narrow, it is still a transfer, " 'as long as the rights thus licensed are "exclusive." ' " (*Id*. at p. 215.) Inputting a software program from a storage medium into the computer's memory "entails the preparation of a copy." (*Micro-Sparc, Inc. v.*

*Amtype Corp.* (D.Mass. 1984) 592 F.Supp. 33, 35.) **(11)** Here, Nortel licensed the right to copy the diskette containing the SSP onto Pacific Bell's switch, making this a valid license of a copyrighted interest under the TTA statutes.

 Even if Pacific Bell does not make and sell a "product," Nortel licensed the right to use patented "processes" within the meaning of the TTA statutes. The TTA statutes cover agreements licensing "the right to make and sell a product *or* to use a process that is subject to the patent or copyright interest." (§§ 6011, subd. (c)(10)(D), 6012, subd. (c)(10)(D), italics added.) The Board incorrectly reads the TTA statutes in the conjunctive rather than the disjunctive. In other words, the Board argues that there must be a transfer of the right to make and sell a product *and* to use a process covered by a patent or copyright.

The plain language of the TTA statutes does not support the Board's interpretation. (See *Preston, supra,* 25 Cal.4th at p. 217 [the Legislature broadened the TTA statutes by using the word "or" instead of "and"].) A TTA includes a written agreement that licenses the right to use a process subject to a patent, even if a tangible product is not being sold. To offer an example given by the Board in regulation 1507, subdivision (a)(1), a company may manufacture a medical device that uses a separate patented process external to the device: although the manufacturer's lease of the tangible equipment is taxable, its transfer of the right to use the patented process is a nontaxable TTA, even if no tangible "product" is created by the medical device. As in the Board's example, Nortel's patented processes for making telephone calls are not embedded in the internal design of the switch equipment at the time of manufacture. Rather, the patented processes are external to the equipment: they are amalgamated on an SSP for application to and use in the equipment. The SSP is licensed, loaded onto the equipment, and the patented processes are used to create telephone calls and telephonic features.

Regulation 1507, subdivision (a)(3) defines a "process" as "one or more acts or steps that produce a concrete, tangible and useful result that is patented by the United States Patent and Trademark Office, such as the means of manufacturing tangible personal property. Process may include a patented process performed with an item of tangible personal property, but does not mean or include the mere use of tangible personal property subject to a patent interest." Relying on regulation 1507, the Board contends that Nortel allowed "the mere use" of its magnetic tapes, disks, or other physical storage media; therefore, it reasons, there was no license of any process subject to a patent interest that qualifies as a TTA.

The testimony showed that each of Nortel's copyrighted SSP's contained one or more of Nortel's patented inventions. By reproducing the SSP on its

switch hardware, Pacific Bell made use of Nortel's processes for producing telephone calls and features—such as call waiting or caller identification—without fear of infringing upon Nortel's patents.[7] Pacific Bell made little use of the tangible disk containing the program, which was simply copied onto its computers, but it made continuous use of the intangible information contained on the disk, information that was necessary to run the switch. Pacific Bell's ability to use the information contained in the SSP was an intangible personal property right.

 Nortel's licensing agreements with Pacific Bell do not expressly reference any patents or copyrights. The Board contends that the absence of such references means that the agreements are not TTA's. Neither the TTA statutes nor the *Preston* case requires that a TTA expressly reference a patent or copyright. (See *Preston, supra,* 25 Cal.4th at p. 214 [absence of any reference to a copyright is "irrelevant"].) All that is required is that the licensed right be "subject to" the patent or copyright. (§§ 6011, subd. (c)(10)(D), 6012, subd. (c)(10)(D).)

The testimony showed that the SSP licensed to Pacific Bell contained patented inventions: use of those processes without a license would infringe upon the patents. Nothing supports the Board's assertion that Nortel transferred no intellectual property to Pacific Bell. The limits contained in the licenses—preventing Pacific Bell from giving the SSP to third parties—underscore the proprietary nature of the SSP. The SSP *can* be copied by Pacific Bell pursuant to the licenses, but only onto its own computers, not onto the computers of third parties.

### 4. *The Validity of Regulation 1507, Subdivision (a)(1)*

 On cross-appeal, Nortel challenges the validity of one sentence in regulation 1507, claiming that it exceeds the Board's authority. The Board enforces the Sales and Use Tax Law, "and may prescribe, adopt, and enforce rules and regulations relating to [its] administration and enforcement . . . ." (§ 7051.) The legislative delegation of authority "is proper even though it confers some degree of discretion on the administrative body. So long as that discretion is executed within the scope of the controlling statute, it will not be disturbed by the courts." (*Henry's Restaurants of Pomona, Inc. v. State Bd. of Equalization* (1973) 30 Cal.App.3d 1009, 1020 [106 Cal.Rptr. 867].)

An administrative agency may not promulgate a regulation that is "inconsistent with the governing statute," or that alters, amends, enlarges, or impairs

---

[7] It is not significant that Pacific Bell could purchase switch hardware and software from Nortel's competitors, who presumably have their own patented processes for operating switches and creating features. When Pacific Bell contracted with Nortel, it used patented processes that belong to Nortel and not to any other vendor.

the scope of the statute. (*Woods v. Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032]; *Nicolle-Wagner v. Deukmejian* (1991) 230 Cal.App.3d 652, 658 [281 Cal.Rptr. 494].) The agency's view is given no deference when a court decides whether a regulation lies within the scope of the agency's authority. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) A regulation that conflicts with the TTA statutes exceeds the scope of the Board's authority and is invalid. (*Preston, supra,* 25 Cal.4th at p. 219.) Even if there is no conflict, the regulation must be " ' " 'reasonably necessary to effectuate the purpose of the statute.' " ' " (*Ibid.*) The burden of demonstrating the invalidity of a regulation falls upon the party challenging it. (*Mission Pak Co. v. State Bd. of Equalization* (1972) 23 Cal.App.3d 120, 125 [100 Cal.Rptr. 69].)

Regulation 1507 implements the TTA statutes. Nortel challenges language stating that a TTA "does not mean an agreement for the transfer of prewritten software as defined in subdivision (b) of regulation 1502, Computers, Programs, and Data Processing." (Reg. 1507, subd. (a)(1).)[8] The trial court declined to invalidate the challenged language in regulation 1507, finding that prewritten programs must be excluded from the scope of the TTA statutes; otherwise, the TTA statutes "would irreconcilably conflict with section 6010.9, rendering a nullity that section's inclusion of canned or prewritten computer programs." Three of the programs Nortel licensed to Pacific Bell are prewritten: the Operator Workstation Software Program, the Data Center Software Program, and the Switch-Connection Software Program. The court denied Nortel a sales tax refund of $2,326,878, plus interest, on licensing proceeds stemming from the three concededly prewritten programs.

██ The TTA statutes broadly encompass "*any* agreement under which a person who holds a patent or copyright interest assigns or licenses to another person the right to make and sell a product or to use a process that is subject to the patent or copyright interest." (§§ 6011, subd. (c)(10)(D), 6012, subd. (c)(10)(D), italics added.) The TTA statutes do not restrict agreements transferring an interest in *prewritten* software. Instead, they apply to "any agreement." Because the TTA statutes cover "any agreement" that involves the sale or license of copyrighted materials or patented processes, the Board cannot exclude prewritten software that is subject to a copyright or patent, thereby creating an exception that the Legislature did not see fit to make.

██ Not every software program qualifies as a TTA: Only the transfer of a program that is subject to a patent or copyright is a TTA. In an uncodified

---

[8] Regulation 1502, subdivision (b)(9) reiterates section 6010.9, defining a prewritten program as one "held or existing for general or repeated sale or lease. The term also includes a program developed for in-house use which is subsequently offered for sale or lease as a product." (Reg. 1502, subd. (b)(9); see fn. 4, *ante,* for the text of § 6010.9, subd. (d).)

section of the statute adopting the TTA amendments, the Legislature stated its intent that the amendments apply to TTA's, and do "not create any inference regarding the application of the Sales and Use Tax Law to *other transactions* involving the transfer of both intangible rights and property and tangible personal property." (Assem. Bill No. 103 (1993–1994 Reg. Sess.) § 3, italics added.) When transfer is made of a computer program that is *not* subject to a copyright or a patent, this is the type of "other transaction" that the Legislature had in mind, and section 6010.9 applies. Thus, a prewritten or "canned" program is taxable if it is not subject to a copyright or patent, and is held for general or repeated sale or lease. (§ 6010.9, subd. (d).)

 The Board exceeded its authority by excluding all prewritten computer programs from the definition of a TTA, even the licensing of a prewritten program "that is subject to [a] patent or copyright interest." (§§ 6011, subd. (c)(10)(D), 6012, subd. (c)(10)(D).) By doing so, the Board altered or impaired the scope of the TTA statutes. If the Legislature did not want the TTA statutes to apply to prewritten—but copyrighted or patented—computer programs, it would have expressly excluded prewritten programs, as it did in section 6010.9.[9] To the extent that regulation 1507, subdivision (a)(1) excludes from the definition of a TTA prewritten computer programs that are subject to a copyright or patent, the regulation exceeds the scope of the Board's authority and does not effectuate the purpose of the TTA statutes: It is, for these reasons, invalid.

In this instance, the Board does not dispute that the three prewritten programs licensed by Nortel are copyrighted. Further, the evidence shows that these programs are subject to Nortel's patents. Thus, Nortel transferred an interest in intangible property that is subject to patents and copyright. (§§ 6011, subd. (c)(10)(D), 6012, subd. (c)(10)(D).) As with the SSP, the prewritten programs are contained on storage media external to the switch hardware, and are loaded onto the switch computers; they are not embedded in the hardware at the time of manufacture. The licenses gave Pacific Bell the right to reproduce the copyrighted material on its computers. As a result, the prewritten programs are TTA's, and are not taxable. The trial court erred by denying Nortel's request for a refund of the sales tax paid to license the prewritten programs.

---

[9] Should the Legislature decide that all prewritten programs ought to be taxed, even if they are subject to a copyright or patent, it can amend the TTA statutes to exclude all prewritten programs.

## DISPOSITION

The portion of the judgment awarding Nortel a refund of the sales tax it paid for licensing switch-specific programs is affirmed. The portion of the judgment denying Nortel's claim for a refund of the sales tax it paid for licensing prewritten programs is reversed, and the court is directed to enter judgment in favor of Nortel on this claim. Nortel is entitled to recover its costs on appeal.

Doi Todd, J., and Ashmann-Gerst, J., concurred.

A petition for a rehearing was denied February 3, 2011, and the petition of appellant Board of Equalization for review by the Supreme Court was denied April 27, 2011, S190946. Corrigan, J., did not participate therein.