[No. A131964. First Dist., Div. One. Dec. 18, 2012.]

MICROSOFT CORPORATION, Plaintiff and Appellant, v.
FRANCHISE TAX BOARD, Defendant and Respondent.

COUNSEL

Sutherland Asbill & Brennan, Jeffrey A. Friedman, Michele Borens and A. Pilar Mata for Plaintiff and Appellant.

Baker & McKenzie, J. Pat Powers, Gary D. Sprague and Amanda Kottke for Software Coalition as Amicus Curiae on behalf of Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Joyce E. Hee and David Lew, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**DONDERO, J.**—In this action, plaintiff Microsoft Corporation seeks a refund of California state corporate franchise taxes paid for the tax years of 1995 and 1996. The taxes were based on income received in connection with the licensing of plaintiff's software and sales of its keyboard and mouse. Plaintiff claims the royalties it received from computer manufacturers for the licensing of the right to replicate and install its software arise from an intangible property right, and therefore should not have been considered in calculating its tax liability. After a court trial, judgment was entered in favor of defendant, the Franchise Tax Board. The court concluded all the royalties at issue were taxable because they constituted receipts from the licensing of computer software products, which the court found to be tangible personal property. We reverse and remand the matter to the trial court for determination of the amount of tax owed by plaintiff based solely on income derived from the sales of its keyboard and mouse during the taxable years at issue.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The parties have stipulated to the following facts. Plaintiff is a corporation organized and existing under the laws of the State of Washington. At all times

relevant to this lawsuit, plaintiff was engaged in the business of developing, licensing, manufacturing, and distributing computer software and providing computer software-related services.[1]

Plaintiff filed timely corporate franchise tax returns for the taxable years ending June 30, 1995 (tax year 1995), and June 30, 1996 (tax year 1996). During the years at issue, plaintiff and all its domestic and foreign subsidiaries operated as a single worldwide "unitary business"[2] for purposes of the Revenue and Taxation Code.

During the relevant tax years, plaintiff entered into licensing agreements with companies referred to as original equipment manufacturers (OEM's) and delivery service providers (DSP's). OEM's are computer sales companies that assemble, and in some cases manufacture, computer systems for sales to end users.[3] These systems include both software and hardware. The OEM's acquire computer equipment from a single vendor, or components from various vendors, and combine them with software into a single product. DSP's are companies that license copyrighted proprietary software through authorized replicators and resell the product to smaller OEM's.

The license agreements (OEM licenses) gave the OEM's the right to install plaintiff's software products into their computer systems and then sell those computer systems with the pre-installed software. There were two methods by which plaintiff's software was made available to the OEM's. First, "Golden Master" disks were generally shipped from plaintiff directly to an OEM upon signing of the licensing agreement. These disks were used by the OEM's in the assembly process to copy the proprietary software onto the hard drives of the units they were assembling. Second, the OEM's obtained plaintiff's software purchased in the form of plastic backup disks separately by the OEM's from third party authorized replicators. These backup disks were bundled with each unit shipped by the OEM's. Royalties would accrue to plaintiff on either a per system or per copy basis, as provided in the particular licensing agreements. Plaintiff also designed a mouse and keyboard that were sold either both as sets or individually. These sales also generated revenue during both tax years at issue.

---

[1] The parties define "software" as "a set of machine-readable programs that cause hardware to perform predetermined tasks."

[2] "A unitary business is generally defined as two or more business entities that are commonly owned and integrated in a way that transfers value among the affiliated entities." (*Citicorp North America, Inc. v. Franchise Tax Bd.* (2000) 83 Cal.App.4th 1403, 1411, fn. 5 [100 Cal.Rptr.2d 509].)

[3] Some of the OEM's included Apple Computers, Inc., Hewlett Packard Co., Dell Products, L.P., and IBM Corporation.

Under the Corporation Tax Law (Rev. & Tax. Code, § 23001 et seq.),[4] California imposes a franchise tax on a corporation doing business in the state based on the corporation's net income derived from or attributable to sources within California. Here, the standard apportionment formula (SAF) was used to calculate plaintiff's franchise tax liability for state taxes. The SAF is based on three factors: property, payroll, and sales. Each of the three factors is expressed as a fraction with the denominator including all of a corporation's activities or assets from everywhere it does business, and the numerator representing the portion of the factor attributable to California. (§§ 25129, 25132, 25134.) For example, the denominator of the property factor consists of the value of all of a corporation's property worldwide. The numerator of the property factor consists of the property based in California.

In calculating the denominator of the sales factor for royalties received from the OEM licenses, plaintiff reported approximately $1.65 billion for tax year 1995, and approximately $2.5 billion for tax year 1996. For the numerator, plaintiff reported royalties received from the licensing of its software in California at just under $235 million in tax year 1995, and just under $407 million for tax year 1996. The numerator represented royalties paid to it by OEM's with billing addresses in California.

In June 2002, defendant issued a notice of proposed assessment (NPA) to plaintiff for franchise taxes for tax year 1995 in the amount of approximately $3.9 million, plus an accuracy-related penalty (ARP) in the amount of $760,260, for a total of approximately $4.7 million. Defendant also issued an NPA for franchise taxes for tax year 1996 in the amount of approximately $21.3 million, plus an ARP in the amount of $477,070, for a total amount of approximately $21.8 million. In August 2002, plaintiff filed a timely protest of the two NPA's.

In September 2007, the parties entered into an agreement whereby, among other things, defendant agreed to withdraw the ARP's imposed for the two fiscal years at issue.

On or about January 15, 2008, plaintiff paid the entire amount of the tax deficiencies asserted in the two NPA's, plus interest. On January 22, 2008, plaintiff filed a complaint in superior court for refund of the franchise taxes and interest imposed by defendant for tax years 1995 and 1996.

---

[4] All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

On February 27, 2008, plaintiff filed administrative claims with defendant for a refund of taxes paid for tax years 1995 and 1996. On June 4, 2008, defendant denied plaintiff's tax refund claims.

On July 7, 2008, plaintiff filed an amended complaint. The complaint asserts four separate causes of action. The first three causes of action relate to the proper computation of plaintiff's California tax liability for the years in question. The fourth cause of action relates to the question of whether defendant was authorized to impose penalties against plaintiff.[5] On August 6, 2008, defendant filed its answer to the amended complaint.

A nonjury trial commenced on August 23, 2010. The trial court issued its statement of decision on February 17, 2011, rejecting plaintiff's refund claim in full. Specifically, the court concluded the licensing of plaintiff's software programs for use in the manufacturing of computers constituted the licensing of tangible personal property, and that the licensing fees paid by California OEM's were properly classified as gross receipts for purposes of calculating the sales factor numerators. In a footnote, the court also found merit to defendant's contention that plaintiff would not be entitled to relief even if the fees were derived from intangible property because it failed to meet its burden of segregating the correct amount of tax owed in connection with certain receipts that were clearly subject to taxation.

On March 15, 2011, the trial court entered judgment in favor of defendant. Plaintiff timely filed its notice of appeal.

## DISCUSSION

### I. *Standard of Review*

The facts surrounding plaintiff's licensing of its software products to the OEM's are undisputed. The issue of whether the trial court correctly determined that the licensing of plaintiff's software programs constituted the licensing of tangible personal property presents a question of law. Matters presenting pure questions of law that do not involve the resolution of disputed facts are subject to an appellate court's independent, or de novo, review. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960]; see *Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 758 [47 Cal.Rptr.3d 216, 139 P.3d 1169] (*Microsoft Corp.*) [The " 'application of a taxing statute to uncontradicted facts is a question of law . . . .' [Citation.]"].)

---

[5] Plaintiff states that the instant appeal "is limited to the trial court's decision regarding the characterization and inclusion of receipts from Microsoft OEM Copyright Royalties in its sales factor apportionment numerator."

## II. *California's Method of Taxing a Unitary Business*

■ California imposes a franchise tax on corporations doing business within the state based on a corporation's net income derived from or attributable to sources within California. (§ 25101.) Our state has adopted the Uniform Division of Income for Tax Purposes Act (UDITPA) (§ 25120 et seq.), which it uses to determine what portion of a multistate company's corporate income it may tax. Under this taxation method, "The portion of a taxpayer's business income attributable to economic activity in a given state is determined by combining three factors: payroll, property, and sales. [Citation.] Each factor is a fraction in which the numerator measures activity or assets within a given state, while the denominator includes all activities or assets anywhere. [Citations.] The combination of these fractions is used to determine the fraction of total global business income attributable to the given state.[6] [Citations.] This method provides a rough but constitutionally sufficient approximation of the income attributable to business activity in each state." (*Microsoft Corp., supra*, 39 Cal.4th 750, 756, original fn. omitted, fn. added.) The application of the unitary business formula employed in California has been found fair and proper in a constitutional sense even though it is "quite different from the method employed . . . by the Federal Government in taxing . . . [a] business . . . ." (*Container Corp. v. Franchise Tax Board* (1983) 463 U.S. 159, 184 [77 L.Ed.2d 545, 103 S.Ct. 2933].)

■ The sales factor, which is the largest component of the three-factor apportionment formula utilized in California, "helps allocate a company's income to various states in accordance with the amount of gross receipts the company generates in each state." (*General Motors Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 773, 778 [47 Cal.Rptr.3d 233, 139 P.3d 1183]; see Rev. & Tax. Code, § 25120, subd. (e); Cal. Code Regs., tit. 18, § 25134, subd. (a).) The sales factor measures the portion of income attributable to a given state by dividing in-state gross receipts by all worldwide gross receipts. (Rev. & Tax. Code, §§ 25120, subd. (e), 25134.) "The sales factor is a ratio comparing sales in a given state to total sales everywhere. . . . Increases in in-state gross receipts will lead to a larger fraction, greater apportioned income, and higher tax; conversely, increases in out-of-state gross receipts will lead to a reduction in the fraction attributable to California and a reduction in California tax." (*Microsoft Corp., supra*, 39 Cal.4th 750, 756–757.) The inclusion of the sales factor in the three-factor apportionment formula is based on the idea that " 'a state which provides a market for a product is entitled to some tax

---

[6] In the present case, the apportionment formula is arrived at by adding the sum of the three fractions and dividing by four. The reason they are divided by four is because the sales factor is double weighted (i.e., it is counted twice). (§ 25128, subd. (a).)

returns on the income which it has helped to produce.' " (*Hoffmann-LaRoche, Inc. v. Franchise Tax Bd.* (1980) 101 Cal.App.3d 691, 699 [161 Cal.Rptr. 838].)

### III. *The OEM Licenses to Replicate and Install Software Programs*

■ The parties dispute whether, for franchise tax purposes, a license to replicate and install software programs in the manufacturing of computers constitutes tangible personal property or intangible property. This distinction is important because different sourcing rules apply to each type of property. A sale of tangible personal property is treated as a sale in California for purposes of computing a corporation's tax liability if the property is shipped to a purchaser within the state. (§ 25135.)[7] In contrast, the sale of intangible property is treated as a California sale only if a greater proportion of the property's "income-producing activity," as measured by its "costs of performance," is performed in this state than in any other state. (§ 25136.)[8]

The trial court concluded computer software is personal property that is inherently tangible, in that it consists of matter arranged and recorded in a physical form to perform a desired function, takes up space on a computer hard drive, and is perceptible to the senses. The court further determined the licensing of plaintiff's software involved the transfer of physical objects (Gold Master disks and backup disks) that were integral to the software's ultimate installation onto the computers manufactured by the OEM's and to the distribution of backup copies to end users. As such, the court concluded plaintiff's royalties from the OEM licenses were properly assigned to the California numerator of the sales factor.

### A. *Contentions on Appeal*

Plaintiff claims the licensing of its software programs involved intangible property and therefore did not constitute California sales because the greater proportion of its costs of performance related to developing, copyrighting, and licensing its software were incurred in the State of Washington. According to plaintiff, approximately 99.5 percent of its direct costs to generate the OEM software royalties occurred outside of California. The only income-producing activity that occurred within this state during the years at issue was

---

[7] Section 25135 provides in part: "Sales of tangible personal property are in this state if: [¶] (1) The property is delivered or shipped to a purchaser . . . within this state regardless of the f.o.b. point or other conditions of the sale. . . ."

[8] Section 25136 provides in part: "(a) [S]ales, other than sales of tangible personal property, are in this state if: [¶] (1) The income-producing activity is performed in this state; or [¶] (2) The income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance."

related to the development of plaintiff's PowerPoint product. These activities represent the remaining half-percent of plaintiff's overall costs of performance. In support of its argument that the OEM licenses involve intangible property rights only, plaintiff relies on "the plain meaning of 'intangible property,' California law, including corporate franchise and sales tax law, and the federal income tax law." Plaintiff correctly notes there is no statutory or regulatory definition of "tangible personal property" in the context of California's corporate franchise tax scheme. It also observes there is no published appellate opinion addressing the use of the term "tangible personal property" within the relevant provisions.

Plaintiff's first contention on appeal is that the OEM licenses concern intangible property rights because "computer software is intangible personal property." Plaintiff has provided us with a dictionary definition of "computer software" defining the term as "intangible personal property consisting of mathematical codes, programs, routines, and other functions that controls the functioning and operation of a computer's hardware." However, several courts in other jurisdictions have concluded that computer software is tangible, at least in the context of sales, use, and property taxation. For example, in *South Central Bell Telephone Co. v. Barthelemy* (La. 1994) 643 So.2d 1240, 1246, the Supreme Court of the State of Louisiana observed: "The software at issue is not merely knowledge, but rather is knowledge recorded in a physical form which has physical existence, takes up space on the tape, disc, or hard drive, makes physical things happen, and can be perceived by the senses."[9] The court further noted: "The software itself, i.e. the physical copy, is not merely a right or an idea to be comprehended by the understanding. The purchaser of computer software neither desires nor receives mere knowledge, but rather receives a certain arrangement of matter that will make his or her computer perform a desired function. This arrangement of matter, physically recorded on some tangible medium, constitutes a corporeal body." (*Ibid.*)

While we appreciate that computer software purchased by an end-user consumer may be characterized as tangible property, our inquiry does not end

---

[9] See *Andrew Jergens Co. v. Wilkins* (2006) 109 Ohio St.3d 396 [2006 Ohio 2708, 848 N.E.2d 499, 502–503] ("To use the purchased software, the purchaser transfers the encoded instructions from the medium to his or her computer. After being transferred to the computer, the instructions are stored on the hard drive of the purchaser's computer to enable the computer to perform the desired operation. Thus, the encoded instructions are always stored on a tangible medium that has physical existence."); *First Data Corp. v. State, Dept. of Revenue* (2002) 263 Neb. 344 [639 N.W.2d 898, 903–904] (concluding computer software is tangible property for purposes of a special sales tax exemption); *Wal-Mart Stores, Inc. v. City of Mobile* (Ala. 1996) 696 So.2d 290, 291 (computer software is tangible personal property for purposes of tax on gross receipts); *Comptroller of the Treasury v. Equitable Trust Co.* (1983) 296 Md. 459 [464 A.2d 248, 261] (concluding computer software is tangible property subject to Maryland's sales tax: "A meaningful sequence of magnetic impulses cannot float in space.").

there. As plaintiff clarifies in its reply brief, "the issue in *this* case is not whether software itself is tangible or intangible property, but whether the *right* to *replicate and install* software is a tangible or intangible property right." (Italics added & omitted.)

## B. *California Sales and Use Tax Law*

### 1. *Tangible Property versus Intangible Property*

Plaintiff contends California sales and use tax law supports its position that the OEM licenses involve intangible property. In the context of retail taxation, the characterization is important because intangible personal property is not subject to sales tax. (*Navistar Internat. Transportation Corp. v. State Bd. of Equalization* (1994) 8 Cal.4th 868, 874 [35 Cal.Rptr.2d 651, 884 P.2d 108] (*Navistar*).) Plaintiff asserts the trial court mischaracterized the underlying transactions in finding them to be "essentially no different from the packaged Microsoft software that is available for direct purchase from retail stores and that is subject to California sales and use tax as a retail sale of tangible personal property." Instead, plaintiff stresses that it licensed to the OEM's the *right to install and replicate* its software programs, which is qualitatively different from the retail sale of software to an ultimate consumer.

■ For purposes of sales tax, the phrase "tangible personal property" is defined by statute as "personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses." (§ 6016.) Our Supreme Court has observed that "Although there is no statutory definition of intangible property, 'such property is generally defined as property that is a "right" rather than a physical object.' [Citation.] 'Thus, for purposes of the law of taxation, intangible property is defined as including personal property that is not itself intrinsically valuable, but that derives its value from what it represents or evidences.' [Citation.]" (*Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197, 208 [105 Cal.Rptr.2d 407, 19 P.3d 1148] (*Preston*).)

### 2. *Preston v. State Bd. of Equalization*

In *Preston, supra,* 25 Cal.4th 197, a professional artist had entered into a number of contracts to provide artwork for use as book illustrations and rubber stamp designs. Pursuant to these agreements, she transferred finished artwork in tangible form. The clients then copied or reproduced images from her finished artwork for use in their products, and returned the artwork to her. As compensation, she typically received a five percent royalty on sales. (*Id.* at pp. 203–204.) She claimed the proceeds were not taxable because she only transferred the right of reproduction and the artwork had been returned to her. (*Id.* at p. 205.)

The Supreme Court observed that "distinguishing between tangible and intangible personal property for taxation purposes has proven troublesome." (*Preston, supra,* 25 Cal.4th 197, 208.) The difficulty arises because the transfer of a copyright "often involves the concurrent transfer of tangible property." (*Id.* at p. 209.) The *Preston* court concluded the agreements at issue were not entirely exempt from taxation "because they involved a transfer of tangible property [(the artwork)] for consideration." (*Id.* at p. 212.) However, the court also found section 6011, subdivision (c)(10), and section 6012, subdivision (c)(10) (pertaining to "technology transfer agreements" (TTA's)), governed the agreements. (*Preston, supra,* at p. 213.) TTA's are defined as "any agreement under which a person who holds a patent or copyright interest assigns or licenses to another person the right to make and sell a product or to use a process that is subject to the patent or copyright interest." (§§ 6011, subd. (c)(10)(D), 6012, subd. (c)(10)(D).)[10] The TTA statutes exempt from taxation the "amount charged for intangible personal property"—specifically, a patent or copyright interest—transferred pursuant to a TTA. (§§ 6011, subd. (c)(10)(A), 6012, subd. (c)(10)(A).)

The agreements in *Preston* were deemed TTA's because they transferred the exclusive *right to reproduce* the taxpayer's copyrighted artwork onto a particular object. (*Preston, supra,* 25 Cal.4th 197, 215.) Further, because the TTA statutes applied, only the portion of the income attributable to the agreements' temporary transfer of her tangible artwork was taxable. (*Id.* at p. 225.)

Significantly, for our purposes, the opinion observed the agreements at issue involved "the separate and distinct *transfer of a copyright—an intangible right distinct from 'any material object in which the work is embodied.'* [Citations.]" (*Preston, supra,* 25 Cal.4th 197, 220, italics added.) In so holding, the court also found intangible property includes a license to use information protected under a copyright or patent. (*Id.* at pp. 216–219.) Thus, *Preston* supports plaintiff's position that the OEM licenses—granting the right to replicate and install—are best understood as involving an intangible property right. Indeed, we view the TTA statutes, although not controlling, as a significant statement by the Legislature indicative of the appropriate characterization of such technology licensing agreements.

3. *Nortel Networks Inc. v. Board of Equalization*

In *Nortel,* the plaintiff sold telephone switching equipment and licensed the software used to operate the equipment. (*Nortel Networks Inc. v. Board of Equalization* (2011) 191 Cal.App.4th 1259, 1265–1266 [119 Cal.Rptr.3d 905]

---

[10] These sections were enacted in 1993. (Stats. 1993, ch. 887, §§ 1, 2, pp. 4826, 4828.)

(*Nortel*).) The trial court found that the licensing fees charged for the plaintiff's unique switch-specific programs were not subject to taxation. However, the court held its prewritten, or "canned," software programs, were taxable. (*Id.* at p. 1268.) On appeal, the plaintiff contended all the licensed software was exempt from sales tax under California's TTA statutes. (*Ibid.*) The appellate court agreed, holding the software was exempt from sales tax because it was protected intellectual property, copied by the licensee onto its computers for the purposes of making and selling products (telephone calls) embodying the copyright. (*Id.* at p. 1264.) The court noted the TTA statutes cover "any" transfer of an interest subject to a patent or copyright, which included the canned software. (*Id.* at p. 1265.) Thus, the plaintiff was entitled to a full refund of the sales taxes it had paid.[11] (191 Cal.App.4th at pp. 1278–1279.)

 Importantly, with respect to computer software, California regulations specifically provide that sales tax does not apply "to license fees or royalty payments that are made for the right to reproduce or copy a program to which a federal copyright attaches in order for the program to be published and distributed for a consideration to third parties, even if a tangible copy of the program is transferred concurrently with the granting of such right." (Cal. Code Regs., tit. 18, § 1502, subd. (f)(1)(B).) The regulations further provide that any storage media used to transmit such program is deemed "merely incidental." (*Ibid.*) This provision would appear to apply to our facts, hypothetically rendering the entire contested transaction exempt from sales tax. Thus, it appears California sales and use tax law would treat the OEM licenses as intangible property. Defendant correctly notes the regulations pertaining to the California sales and use tax law do not apply to the sourcing of licensing fees for corporate franchise tax purposes. (See Cal. Code Regs., tit. 18, § 1500, subd. (a).) Nevertheless, while California sales tax cases and regulations are not controlling as to the outcome of this franchise tax case, we find them to be relevant. In particular, we see no rational justification for treating licenses to replace software as *intangible* in the context of sales taxation, while treating these very same licenses as *tangible* in the context of franchise taxation.

## 4. *Earlier Sales Tax Law Cases Are Not Persuasive*

In dismissing *Preston*, the trial court here reasoned the TTA provisions are "applicable only to sales and use tax, and the Court [was] unaware of any

---

[11] The appellate court also found that to the extent California Code of Regulations, title 18, section 1507, subdivision (a)(1), purports to exclude, from the definition of a TTA, prewritten computer programs that are subject to a copyright or patent, the regulation exceeded the scope of the defendant's regulatory authority as it did not effectuate the purpose of the TTA statutes. (*Nortel, supra*, 191 Cal.App.4th 1259, 1278.)

corresponding statutes applicable to corporate franchise tax." Instead, the court relied, in part, on California cases predating the enactment of the TTA provisions. Those cases hold that a transfer of tangible personal property (such as a master tape or master recording) that embodies intellectual property may be treated, in its entirety, as a taxable sale of tangible personal property.

For example, in *Simplicity Pattern Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 900, 906 [167 Cal.Rptr. 366, 615 P.2d 555] (*Simplicity*), the Supreme Court held the sale of film negatives and recordings that were physically useful in the manufacturing process (and that transmitted plaintiff's intellectual property) resulted in a taxable sale of tangible personal property. This was so even though the court agreed that intellectual property is an " 'intangible incorporeal right' " existing separately from the physical medium that embodies it. (*Ibid.*; see *A&M Records, Inc. v. State Bd. of Equalization* (1988) 204 Cal.App.3d 358, 376 [250 Cal.Rptr. 915] (*A&M Records*) [royalties from licensing of master tapes to record clubs for record production were taxable because master tapes were essential in the ultimate production of the records]; *Capitol Records, Inc. v. State Bd. of Equalization* (1984) 158 Cal.App.3d 582, 587 [204 Cal.Rptr. 802] (*Capitol Records*) [royalties from licensing of master recording tapes useful in the manufacturing process were subject to tax as sale of tangible personal property].)[12]

Subsequently, in *Navistar, supra*, 8 Cal.4th 868, the Supreme Court ruled the sale of internally developed computer programs by the taxpayer to another company constituted a sale of a tangible asset, and thus was subject to sales tax because the design and development of the computer programs had already been completed or prewritten. (*Id.* at pp. 880–881.)[13] The *Navistar* court, concurring with the *Simplicity* decision, observed that a sale does not " 'become[] nontaxable whenever its principal purpose is to transfer the intangible content of the physical object . . . .' " (*Navistar, supra*, at

---

[12] It is noteworthy that the holdings of *Simplicity*, *A&M Records*, and *Capitol Records* have been limited by the enactment of the TTA provisions. (See *Preston, supra*, 25 Cal.4th 197, 221 ["To the extent that *Simplicity* . . . suggests that copyrights transferred in a technology transfer agreement may be taxed, . . . sections 6011(c)(10) and 6012(c)(10) supersede it."].)

[13] By statute, custom-made software is not subject to sales tax: The Sales and Use Tax Law (§ 6001 et seq.) excludes from taxation "the design, development, writing, translation, fabrication, lease, or transfer for a consideration of title or possession, of a custom computer program . . . ." (§ 6010.9.) The rationale for the rule is that the service involved in creating custom software is not taxable, because charges for services are generally not subject to sales tax: " 'In the enactment of section 6010.9 the Legislature has recognized that the design, development or creation of a custom computer program to the special order of a customer is primarily a service transaction and, for that reason, not subject to sales tax. . . .' [Citation.]" (*Navistar, supra*, 8 Cal.4th 868, 881.)

p. 876, italics omitted.)[14] *Navistar* is not controlling here, however, as the transfer of copyrights was not at issue. (8 Cal.4th at p. 880.)[15]

Defendant selectively relies on pre-*Preston* California sales tax cases such as *Simplicity*, in support of its argument that because plaintiff's software programs "were inextricably intertwined with the disks on which they were embedded, the licensing fees constituted gross receipts from the licensing of tangible personal property." At the same time, defendant dismisses *Preston* and California Code of Regulations, title 18, section 1502, on the ground that they concern sales tax and have "no relevance" to corporate franchise taxation.[16] In our view, defendant's approach is *inconsistent* in that, by parity of reasoning, the older sales tax cases it relies on also have "no relevance" to franchise taxation.

But even under the rationale of *Simplicity*, we question whether plaintiff's Gold Master disks are analogous to film negatives and master recordings. The disks themselves were not essential to the reproduction process. Rather, they were simply a means used to transmit plaintiff's software programs. Presumably plaintiff could have used other, outmoded methods to transfer such data to the OEM's, including floppy discs, punch cards, or even paper printouts of the code itself. Thus, there was nothing unique about the Gold Master disks themselves. Instead they served merely as a convenient storage medium to transfer plaintiff's copyrighted content: "Inputting a software program from a storage medium into the computer's memory 'entails the preparation of a copy.' [Citation.]" (*Nortel, supra*, 191 Cal.App.4th 1259, 1274.)

Nor does the Nebraska Supreme Court case of *American Business Information, Inc. v. Egr* (2002) 264 Neb. 574 [650 N.W.2d 251] (*American Business*), also relied on heavily by the trial court, persuade us that defendant's stance is correct. In *American Business*, customers acquired prospect lists, index cards, computer diskettes, magnetic tapes, CD-ROM's and online data containing information to help them find prospective customers. The

---

[14] In *Preston*, the court cited to *Simplicity* and its progeny, observing "these decisions establish that any transfer of tangible property *physically useful* in the manufacturing process is subject to sales tax even though the true object of the transfer is an intangible property right like a copyright. [Citation.] The purpose or nature of the transfer and the form of payment are irrelevant." (*Preston, supra*, 25 Cal.4th 197, 211.)

[15] Defendant suggests that the administrative regulations on the treatment of fees paid to motion picture and television film producers for the right to exhibit or transmit their proprietary motion picture films offer guidance in this case (see Cal. Code Regs., tit. 18, §§ 25137–25138). We do not find the analogy to be very compelling as the OEM licenses involve replication, not exhibition or transmission.

[16] As noted above, under California Code of Regulations, title 18, section 1502, subdivision (f)(1)(B), the medium used to store and transmit computer software in conjunction with TTA's is deemed incidental, and thus does not qualify as a tangible item subject to sales tax.

court held the computerized information goods licensed by the taxpayer to its customers were tangible personal property for purposes of computing Nebraska's sales factor. (*Id.* at pp. 256–257.) *American Business* is distinguishable in that, unlike the OEM's here, the plaintiff's customers did *not* acquire a right to replicate and install the software in their products. Instead, the customers were granted "a license to use [the plaintiff's] products in the ordinary course of their businesses." (*Id.* at p. 256.) The customers thus did not acquire any of the taxpayer's intellectual property rights. (*Ibid.*) In contrast, here the OEM's were granted an intellectual copyright interest in plaintiff's software, namely, the right to replicate and install the software on their computers. The licenses did not give the OEM's the right to *use* the software, but only the right to *copy* the software, for sale to and use by an end-user consumer.[17]

## C. *Unpublished Decision of the State Board of Equalization*

Plaintiff also draws our attention to a 1997 unpublished decision of the State Board of Equalization (SBE), *Appeal of Adobe Systems, Inc.* (SBE, Aug. 1, 1997) 1997 Cal.Tax Lexis 257 (*Adobe*).[18] In *Adobe*, the SBE considered whether a California-based taxpayer had properly sourced royalty receipts derived from licensing the right to copy and install software on computer manufacturers' equipment for purposes of calculating the taxpayer's California sales factor. At issue was whether, based on the costs of performance, a greater proportion of the taxpayer's income-producing activity was performed in this state with respect to royalties (apparently) earned from licenses granted to businesses located in the State of Massachusetts. The opinion includes the following statement: "Based on the facts of this case, and the applicable regulations, it seems clear that appellant's royalties from the licensing contracts constitute gross receipts from the licensing of *intangible personal property* and should be attributed to California for purposes of determining appellant's California sales factor." (1997 Cal.Tax Lexis at p. *13, italics added.)

While an interpretation put forth by an administrative agency charged with enforcement, implementation and interpretation of enactments is entitled to great weight (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281]),

---

[17] At oral argument, defendant asserted the trial court's conclusions were based primarily on the fact that plaintiff's royalties were computed on a per-sale basis (of the OEM computers), as opposed to a per-replication basis. However, the court's statement of decision does not overly emphasize this point. In any event, royalties for the licensing of copyrighted materials are typically paid based on actual sales. We thus see nothing remarkable about the manner in which the royalties were accounted for here.

[18] The SBE reviews appeals from the decisions of the Franchise Tax Board (see §§ 19332–19334).

a court may properly accept or reject it according to the validity of its reasoning, its consistency, "and all those factors which give it power to persuade, if lacking power to control." (*Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140 [89 L.Ed. 124, 65 S.Ct. 161].) Here, the *Adobe* opinion's administrative interpretation is informative.[19] It is true that the opinion does not include an extensive analysis as to whether such licenses concern tangible personal property or intangible property. Instead, it concisely states that the licensing of the taxpayer's software product involved intangible property. We find it troubling, however, that defendant appears to have advocated a position in *Adobe* that is directly contrary to the position it advances against plaintiff in the present case. Unfortunately, the inconsistency suggests a result-orientated bias based on the domicile of the taxpayer.

D. *Federal Tax Law*

Finally, we also find guidance in federal tax law. We note section 25114 adopts the definition of intangible property found in section 936(h)(3)(B) of the federal Internal Revenue Code (26 U.S.C.). That federal section defines "intangible property" to include franchises, licenses and contracts, as well as copyrights and literary, musical or artistic compositions. Additionally, 26 Code of Federal Regulations part 1.861-18(b)(1)(i) and (c)(2)(i) (2012) defines "copyright rights" for purposes of federal tax law as including the right to make copies of a computer program for purposes of distribution to the public by sale or other transfer of ownership, or by rental, lease or lending.

Defendant claims these federal statutes and regulations do not specifically characterize computer software itself as either tangible personal property or intangible property. Defendant further contends federal statutes and regulations have little relevance to the principles of formula apportionment under the unitary business principle, because federal law provides that a corporation is taxed on all of its income, regardless of where it is earned. (See *Apple, Inc. v. Franchise Tax Bd.* (2011) 199 Cal.App.4th 1, 8 [132 Cal.Rptr.3d 401].) We disagree and find federal law helpful as to the appropriate characterization of the transferred rights at issue here.[20]

---

[19] We note the *Adobe* decision itself is classified as unpublished and therefore is not binding, even on the SBE itself. In *Appeal of Charles W. Fowlks* (Oct. 31, 1989, No. 86R-0799-RO, 88-SBE-023-A) 1989 Cal.Tax Lexis 32, the SBE noted that "Summary decisions of this board are not citable authority and will not be relied upon or given any consideration by this board as precedent." (Cf. Cal. Rules of Court, rule 8.1115 [unpublished appellate court decisions "must not be cited or relied on by a court or a party in any other action"].)

[20] Amicus curiae Software Coalition urges us to "adopt as guiding principles for the classification of transactions involving software" the United States Treasury Department's "well-considered system of classification for software transactions." The Software Coalition asserts that following the federal system "aligns with prevailing global standards, promotes consistency with other jurisdictions, makes tax compliance simpler and more efficient for both

In sum, the trial court here erred in concluding that the OEM licenses pertained to the licensing of tangible personal property. Accordingly, the computation of the sales factor in the SAF improperly included the gross receipts plaintiff obtained from these licenses.

## IV. *Burden of Proving the Correct Amount of Tax Owed*

Defendant reiterates the trial court's apparent alternate holding, arguing that even if plaintiff is correct that the OEM licenses involved intangible personal property, it still is not entitled to a refund because it has not proven the correct amount owed with respect to income derived from the California-based PowerPoint program, or its keyboard and mouse.

As to PowerPoint, plaintiff points out that all of its software was licensed to the OEM's as part of a bundle of products. Thus, the revenue attributable to PowerPoint (estimated at one-half of 1 percent of plaintiff's total revenue) was not separately paid for nor separately accounted for in its business records. As plaintiff's counsel noted at oral argument, California permits the taxpayer to rely on its own accounting methods in determining its items of income. (See Cal. Code Regs., tit. 18, § 25136, subd. (c).) Regardless, in our view the percentage of income attributable to PowerPoint qualifies as de minimis. Accordingly, as the vast majority of the costs of performance for the royalties were incurred in the State of Washington, the entire amount of the royalties received from the OEM license for the bundled software must be excluded from the numerator of the sales factor for purposes of determining plaintiff's liability for California corporate franchise taxes.

As to the keyboard and mouse, defendant claims the reported numbers provided by plaintiff comprise part of the grand total of OEM royalty income for the tax periods at issue do not correlate with the royalty amounts from OEM's that plaintiff reported in the denominator of its sales factor. Plaintiff does not dispute that receipts from hardware sales should be included in the sales factor numerator. It claims the amount attributable to the sales of the keyboard and mouse constitute approximately six percent of its income. The issue was not squarely addressed below, as the trial court concluded all the OEM royalties were taxable. We conclude plaintiff did not fail to meet its burden to prove the amount of tax owed and remand this matter to the trial court for further proceedings consistent with this opinion.

---

taxpayers and tax collectors." It further claims that the failure to align with federal software regulations "sends the wrong message internationally." Our decision is not based on these considerations as such policy matters are more properly directed to our state Legislature.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court to determine the amount of tax owed by plaintiff based on income derived solely from the sales of its keyboard and mouse during the taxable years at issue.

Marchiano, P. J., and Banke, J., concurred.

A petition for a rehearing was denied January 15, 2013.