Filed 11/3/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC. et al., | B257808 |
| Plaintiffs, Cross-defendants, and Respondents, | (Los Angeles County Super. Ct. No. BC402036 and BC448715) |
| v. | |
| STATE BOARD OF EQUALIZATION, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant, Cross-complainant, and Appellant. | NO CHANGE IN JUDGMENT |

THE COURT:*

It is ordered that the opinion filed herein on October 8, 2015, be modified as follows:

1.  On page 4, the second paragraph, line 11, the words "a copy of the software and for" are inserted in between "for" and "the"; and the words "AT&T/Lucent's" are deleted, so the sentence reads:

> The telephone companies paid AT&T/Lucent $303,264,716.51 for a copy of the software and for the licenses to copy and use that software on their switches.

2.  On page 5, the third paragraph, line 10, the words "software and" are inserted in between "the" and "licensing" so the sentence reads:

> As a result, the court ordered the Board to refund the sales tax paid on the software and licensing fees.

---

\*      ASHMANN-GERST, Acting P.J.,      CHAVEZ, J.,      HOFFSTADT, J.

3.  On page 15, the last paragraph, line 6, the word "the" in between "that" and "AT&T/Lucent's" is deleted; and line 8, beginning with the words "and the Board", the sentence is deleted so that the sentence reads:

> The Board argues that AT&T/Lucent's evidence on this point was provided through the declarations of persons without personal knowledge, but these declarations specifically state to the contrary.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

**<u>CERTIFIED FOR PUBLICATION</u>.**

Filed 10/8/15 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC., et al., <br><br>      Plaintiffs, Cross-defendants, and Respondents, <br><br>      v. <br><br> STATE BOARD OF EQUALIZATION, <br><br>      Defendant, Cross-complainant, and Appellant. | B257808 <br><br> (Los Angeles County <br> Super. Ct. Nos. BC402036 and BC448715) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Steven J. Kleifield, Judge. Affirmed.

Paul Hastings, Jeffrey G. Varga, Julian B. Decyk, Paul W. Cane, Jr., Amy L. Lawrence, for Plaintiffs, Cross-defendants, and Respondents.

Kamala D. Harris, Attorney General, Paul D. Gifford, Senior Assistant Attorney General, Diane S. Shaw, Stephen Lew, Supervising Deputy Attorneys General, and Ronald N. Ito, Deputy Attorney General, for Defendant, Cross-complainant, and Appellant.

\*      \*      \*

A manufacturer sells sophisticated telecommunications equipment to nine different telephone companies, who in turn use that equipment to provide telephone and Internet services to their customers. In the transactions between the manufacturer and telephone companies, the companies paid for (1) the equipment, (2) written instructions on how to use the equipment, (3) a copy of the computer software that makes the equipment work, and (4) the right to copy that software onto the equipment's hard drive and thereafter to use the software to operate the equipment. In *Nortel Networks Inc. v. State Board of Equalization* (2011) 191 Cal.App.4th 1259 (*Nortel*), we held that an almost identical transaction satisfied the requirements of California's technology transfer agreement statutes (Rev. & Tax. Code, §§ 6011, subd. (c)(10) & 6012, subd. (c)(10))[1] and, as such, the manufacturer was responsible for paying sales taxes only on the tangible portions of the transaction (the equipment and instructions), but not the intangible portions (the software and rights to copy and use it). Notwithstanding *Nortel*, the State Board of Equalization (Board) in this case persisted in assessing a sales tax of nearly $25 million on the intangible portions of nearly identical transactions. The manufacturer paid the taxes, and filed this action seeking a refund.

The Board's assessment of the sales tax was erroneous. In so concluding, we hold that (1) the manufacturer's decision to give the telephone companies copies of the software on magnetic tapes and compact discs (rather than over the Internet) does not turn the software itself or the rights to use it into "tangible personal property" subject to the sales tax, (2) a "technology transfer agreement" within the meaning of sections 6011, subdivision (c)(10)(D) and 6012, subdivision (c)(10)(D), which exempts from the sales tax the intangible portions of a transaction involving both tangible and intangible property, can exist when the only intangible right transferred is the right to copy software onto tangible equipment, and (3) a technology transfer agreement can exist as long as the grantee of copyright or patent rights under the agreement thereafter copies or incorporates

---

[1]     All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

a copy of the copyrighted work into its product or uses the patented process, and any of these acts is enough to render the resulting product or process "subject to" the copyright or patent interest.

Moreover, because the Board's trenchant opposition to the manufacturer's refund action in this case was all but foreclosed by *Nortel* and other binding decisional and statutory law, the Board's position was not "substantially justified" and the trial court did not abuse its discretion in awarding the manufacturer its "reasonable litigation costs."

We accordingly affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Telephone Networks Generally

The telephone and data network in the United States is both terrestrial (land-based) and wireless, and is seamlessly interconnected through equipment called switches that are housed in so-called central offices scattered around the country. A single switch is comprised of "numerous computer processors, frames (sometimes called cabinets), shelves, drawers, circuit packs, cables, trunks and many other pieces of hardware." A switch serves two functions: (1) it routes incoming and outgoing calls or data streams toward their ultimate destination on the nation's network; and (2) it operates a panoply of features, ranging from call waiting, three-way calling and call forwarding to "caller ID" and voicemail. Because each switch is located in a unique place along the network, and because each can offer a different mix of features, "no two switches [are] alike."

Switches perform sophisticated and complex functions, and every switch is run by a computer. Each switch's computer runs two types of software: (1) software designed specifically for that switch (unimaginatively called "switch-specific software"); and (2) more generic software designed for use on any switch because it runs diagnostic tests and manages the availability of lines and trunks used to route calls and data between switches. Switch-specific software is drawn from a master, "basic code"; the switch-specific software for any given switch uses only those portions of the "basic code" necessary for the switch to know where it is on the network and to offer the features that its new owner has requested. (See *Nortel*, *supra*, 191 Cal.App.4th at pp. 1266-1267.)

3

## II.     Underlying Transactions

Prior to 1996, AT&T Corporation (AT&T) manufactured switches.  On February 1, 1996, AT&T spun off its Network Services Division, which was responsible for manufacturing switches, into a separate company called Lucent Technologies, Inc. (Lucent).  AT&T and Lucent (collectively, AT&T/Lucent) designed the software (both switch-specific and generic) that runs the switches they sell.  That software is copyrighted because it is an original work of authorship that has been fixed onto tapes; the software also embodies, implements, and enables at least one of 18 different patents held by AT&T/Lucent.

Between January 1, 1995 and September 30, 2000, AT&T/Lucent entered into contracts with nine different telephone companies[2] to (1) sell them one or more switches, (2) provide the instructions on how to install and run those switches, (3) develop and produce a copy of the software necessary to operate those switches, and (4) grant the companies the right to copy the software onto their switch's hard drive and thereafter to use the software (which necessarily results in the software being copied into the switch's operating memory).  AT&T/Lucent gave the telephone companies the software by sending them magnetic tapes or compact discs containing the software.  AT&T/Lucent's placement of the software onto the tapes or discs, like the addition of any data to such physical media, physically altered those media.  The telephone companies paid AT&T/Lucent $303,264,716.51 for the licenses to copy and use AT&T/Lucent's software on their switches.[3]

---

[2]     Those companies are Pacific Bell, GTE Corporation, Advanced TelCom Group, Inc., Allegiance Telecom, Alpine PCS, Inc., RCN Services, US TelePacific Corporation, West Coast PCS, LLC, and Winstar Communications, Inc.

[3]     The contract price of the switches and the instructions are not part of the record.

4

## III.    Tax Assessment

The Board assessed the sales tax on the full amount of the licensing fees paid under the contracts between AT&T/Lucent and its telephone company customers.  At the then-current sales tax rate of 8.5 percent, this came to a sales tax liability of $24,773,185.38.  As required by the state Constitution (Cal. Const., art. XIII, § 32), AT&T/Lucent paid the sales tax and then sought a refund from the Board.  The Board denied its application.

## IV.    Litigation

AT&T/Lucent sued the Board for a refund of the sales tax attributable to the software and licenses to copy and use that software.  AT&T/Lucent filed two lawsuits— one covering the taxes paid between January 1, 1995 and January 31, 1996 before Lucent broke away from AT&T (*Lucent I*), and a second covering the period between February 1, 1996 and September 30, 2000 (*Lucent II*).[4]  In response to each complaint, the Board filed a cross-complaint seeking unpaid interest on the sales tax already paid—namely, $6,319,583.44 in the *Lucent I* cross-complaint and $12,321,890.58 in the *Lucent II* cross-complaint.

The parties filed cross-motions for summary judgment on AT&T/Lucent's tax refund claims, and the trial court issued a 15-page ruling granting AT&T/Lucent's motions.  The court concluded that the contracts between AT&T/Lucent and the telephone companies were technology transfer agreements within the meaning of sections 6011, subdivision (c)(10) and 6012, subdivision (c)(10), such that AT&T/Lucent was obligated to pay sales taxes on the tangible portion of the sale (that is, for the switches, the instructions, and the 3,954 blank tapes and/or compact discs used to transmit the software), but not required to pay sales taxes on the intangible portion (that is, for the software and licenses).  As a result, the court ordered the Board to refund the sales taxes paid on the licensing fees.  With other adjustments, the court ordered a refund of

---

[4]    AT&T/Lucent initially sought additional relief in *Lucent I*, but later dismissed those claims.

$24,502,381.43. The parties subsequently stipulated that AT&T/Lucent owed $1,938,574 in unpaid interest out of the $6.3 million sought in the Board's *Lucent I* cross-complaint, but none of the $12.3 million in unpaid interest sought in the *Lucent II* cross-complaint.

AT&T/Lucent sought its court costs, and under section 7156, its "reasonable litigation costs," including attorney's fees. The court awarded costs of $7,052.36, and after finding the Board's position in the litigation was not "substantially justified," awarded $2,625,469.87 in "reasonable litigation costs."

The court entered judgment, and the Board timely appeals.

## DISCUSSION

### I. Background Law on California's Sales Tax

The State of California imposes a sales tax upon sellers "[f]or the privilege of selling tangible personal property." (§ 6051; *Navistar Internat. Transportation Corp. v. State Board of Equalization* (1994) 8 Cal.4th 868, 872 (*Navistar*); see also *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1104 (*Loeffler*) ["the *retailer* is the taxpayer, *not* the consumer"].) The tax is tied to a percentage of the seller's "gross receipts." (§ 6051; see § 6012 [defining "gross receipts"].) The percentage at the time pertinent to the transactions in this appeal was 8.5 percent.

As relevant to this appeal, a "sale"—the event that triggers the sales tax—includes "[a]ny transfer of title or possession, exchange, or barter, contractual or otherwise, in any manner or by any means whatsoever, of *tangible personal property* for a consideration" as well as "[a]ny lease of *tangible personal property* in any manner or by any means whatsoever" unless otherwise exempted by statute. (§ 6006, subds. (a) & (g), italics added.) A "lease" includes a "license." (§ 6006.3.) As the italicized text makes clear, the sales tax attaches only to transactions involving "tangible personal property." "Tangible personal property" means "personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses." (§ 6016.) If tangible personal property is transferred, the parties' reasons for the transfer do not matter; thus, the transfer of tangible personal property is subject to the sales tax

6

even if that property is being purchased more for its intellectual content than its physical components. (*Navistar*, *supra*, 8 Cal.4th at p. 878; *Simplicity Pattern Co. v. State Board of Equalization* (1980) 27 Cal.3d 900, 909, superseded by §§ 6011, subd. (c)(10) & 6012, subd. (c)(10) (*Simplicity Pattern*).) This is why the purchase of a book "for its own sake"—and not as part of a larger transaction transferring any copyright rights along with the book—is still considered a sale of tangible personal property and thus subject to the sales tax. (*Navistar*, at pp. 877-878 [sale of drawings and designs for industrial turbine engines that are uncopyrighted trade secrets, without any transfer of intellectual property rights, is a taxable sale].)

However, transactions not involving tangible personal property, such as the sale of services or the sale of intangible personal property, are *not* subject to the sales tax. (See *Overly Mfg. Co. v. State Board of Equalization* (1961) 191 Cal.App.2d 20, 24 ["Sales tax statutes do not impose a tax on services . . ."]; *Preston v. State Board of Equalization* (2001) 25 Cal.4th 197, 208 (*Preston*) ["intangible personal property is not subject to sales tax"].) The Revenue and Taxation Code does not define "intangible personal property" (*Navistar*, *supra*, 8 Cal.4th at p. 875), but courts have "generally defined [it] as property that is a 'right' rather than a physical object" (*ibid.*). "Intangible property includes a license to use information under a copyright or patent." (*Nortel*, *supra*, 191 Cal.App.4th at p. 1269; *Preston*, at pp. 216-219.)

Whether a transaction involving *both* taxable and not-taxable components is subject to the sales tax turns on two considerations: (1) whether the taxable and not-taxable components are "inextricably intertwined" rather than "readily separable"; and, if they are inextricably intertwined, (2) whether the not-taxable component is a service or is intangible personal property. (See *Dell, Inc. v. Superior Court* (2008) 159 Cal.App.4th 911, 924-925 (*Dell*).) Where the transaction involves components that are "readily separable" and not "inextricably intertwined," the sales tax is assessed against the component of the transaction involving tangible personal property and not assessed against the remaining, not-taxable component. (*Dell*, at p. 925.)

7

Determining how to apply the sales tax to a transaction where tangible personal property is inextricably intertwined with components not subject to the sales tax is, as our Supreme Court has noted, more "troublesome." (*Preston*, *supra*, 25 Cal.4th at p. 208.) In this instance, the question of taxation hinges on the nature of the untaxable component. (*Dell*, *supra*, 159 Cal.App.4th at pp. 924-925 ["California views sales of tangible property bundled with intangibles, rather than services, differently"].) When the untaxable component is a *service*, a court is to determine whether the "true object" of the transaction is the sale of tangible personal property or instead the performance of a service. (Cal. Code. Regs., tit. 18, § 1501; *Preston*, at p. 209; *Navistar*, *supra*, 8 Cal.4th at p. 875.) This determination is dispositive: If the "true object" is the sale of tangible personal property, the whole transaction is subject to the sales tax; if the "true object" is the performance of a service, no portion—even the tangible storage media used to perform the service—of the transaction is subject to the sales tax. (*General Business Sys. v. State Board of Equalization* (1984) 162 Cal.App.3d 50, 55 [no sales tax to be assessed on tangible storage media used to provide a service].) Indeed, section 6010.9 codified this rule with respect to the service of creating "custom computer programs." (§ 6010.9; cf. *Navistar*, at pp. 880-883 [downstream sale of originally custom-made software is no longer an exempted sale of a service]; *Touche Ross & Co. v. State Board of Equalization* (1988) 203 Cal.App.3d 1057, 1064 (*Touche Ross*) [same].)

Where, as here, the untaxable component is intangible personal property, the default rule is to determine whether the tangible portion of the transaction is "essential" or "physically useful" to the purchaser's subsequent use of the intangible personal property portion of the transaction. (*Preston*, *supra*, 25 Cal.4th at pp. 211-212 [looking to whether tangible personal property component is "essential"]; *Navistar*, *supra*, 8 Cal.4th at p. 878 [looking to whether the intangible property is "physically useful[] . . . [to] the buyer's manufacturing process"].) Under this rule, the "true object" of the transaction is irrelevant. (*Preston*, at p. 211; *Navistar*, at p. 876.) Thus, when a seller confers an intangible license to copy a copyrighted matter and gives the buyer a physical copy of the copyrighted matter needed to make use of that license—as is the case with

8

film negatives, master audio recordings, or artwork to be used to make rubber stamps or for integration into a printing plate for a book—the entire transaction is subject to the sales tax. (See *Preston*, at pp. 211-212 [illustrations to be used to make rubber stamps and book plates]; *A&M Records, Inc. v. State Board of Equalization* (1988) 204 Cal.App.3d 358, 364, 375-376, superseded by §§ 6011, subd. (c)(10) & 6012, subd. (c)(10) [original master audio tapes]; *Capitol Records v. State Board of Equalization* (1984) 158 Cal.App.3d 582, 596, superseded by §§ 6011, subd. (c)(10) & 6012, subd. (c)(10) [same]; *Simplicity Pattern*, *supra*, 27 Cal.3d at p. 912 [master audio recordings].) Conversely, when a seller grants an intangible license to copy copyrighted material or to use a patent and transfers the material using tangible media that is not essential to the buyer's use of the license or any further manufacturing process—as is the case when software is transmitted via a disk that is "not essential" or otherwise physically useful to the buyer's subsequent use of that software—the entire transaction is *not* subject to the sales tax. (*Microsoft Corp. v. Franchise Tax Board* (2012) 212 Cal.App.4th 78, 92 (*Microsoft*) [so holding].) This default rule is thus an all-or-nothing affair; depending on the centrality of the tangible personal property to the subsequent use of the intangible personal property, either the entire transaction is taxable or it is not.

But this is only the default rule. In 1993, our Legislature enacted the technology transfer agreement statutes and thereby set up a special rule for technology transfer agreements by excluding them from the definition of "sales" and "gross receipts." (§§ 6011, subd. (c)(10), 6012, subd. (c)(10); *Preston*, *supra*, 25 Cal.4th at p. 212.) A technology transfer agreement is "any agreement under which" (1) "a person who holds a patent or copyright interest" (2) "assigns or licenses to another person the right to make and sell a product or to use a process" (3) "that is subject to the patent or copyright interest." (§§ 6011, subd. (c)(10)(D), 6012, subd. (c)(10)(D).) Instead of sales tax liability attaching to all or none of the transaction, a taxpayer who enters into a contract that qualifies as a technology transfer agreement is required to sort the tangible personal property from the intangible, and to pay sales tax on the tangible personal property that is transferred but not on "the amount charged for [the] intangible personal property

9

transferred." (§§ 6011, subd. (c)(10)(A) & 6012, subd. (c)(10)(A); *Preston*, at p. 212.) The statutes provide three mechanisms—in declining order of preference—for calculating the value of the tangible personal property: (1) the price stated in the agreement itself (§§ 6011, subd. (c)(10)(A) & 6012, subd. (c)(10)(A)); (2) the price at which "the tangible personal property or like tangible personal property has been previously sold or leased, or offered for sale or lease, to third parties at a separate price" (§§ 6011, subd. (c)(10)(B) & 6012, subd. (c)(10)(B)); or (3) 200 percent "of the cost of materials and labor used to produce the tangible personal property" (§§ 6011, subd. (c)(10)(C) & 6012, subd. (c)(10)(C)).

## II.     Summary Judgment Ruling

Because AT&T/Lucent did not seek a refund of the sales tax assessed against the switches themselves and conceded the sales tax was properly assessed against the written instructions, the remaining question is whether the Board correctly assessed sales taxes on (1) the computer software sent to the telephone companies using tapes and compact discs, and (2) the licenses to copy and use that software on the switches.

The Board argues that the transfers of the software and licenses are wholly taxable, and that the trial court's summary judgment ruling to the contrary is erroneous for three reasons. First, the software is tangible personal property because the act of placing the software onto magnetic tapes and compact discs physically altered those media. Because those alterations can be (microscopically) seen and are otherwise "perceptible to the senses" (§ 6016), the Board argues that the software itself became tangible personal property and that the both the software and the licenses are subject to the sales tax (ostensibly because the license to copy and use the software is, in the Board's view, incidental to the transfer of the software itself).[5] Second, even if the software and the licenses to copy and use it are not deemed to be "tangible personal property," the contracts between AT&T/Lucent and the telephone companies are not

---

[5]     We note that the Board's attempt to assess the sales tax on the licenses themselves is inconsistent with the position it took in *Nortel*, where it conceded that the licenses were not taxable. (*Nortel*, *supra*, 191 Cal.App.4th at p. 1273.)

technology transfer agreements because (1) they did not transfer a sufficiently "meaningful" cluster of intellectual property rights to the telephone companies, and (2) AT&T/Lucent did not prove that, without the licenses, the telephone companies' use of the software would constitute copyright and/or patent infringement. Third, even if the contracts qualify as technology transfer agreements, AT&T/Lucent did not sufficiently establish the cost of developing the software, and thus the entire transaction should be taxable.

We independently review the trial court's grant of summary judgment. (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 415.) Our task is to ascertain whether any "triable issue exists as to any material fact" (*ibid.*), and we do so by independently reviewing the record, by viewing the evidence in the light most favorable to the Board (as the losing party below), and by resolving any evidentiary doubts and ambiguities against summary judgment (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 605-606). To the extent the summary judgment ruling turns on questions of statutory interpretation, we also review such questions independently. (*Weinstein v. County of Los Angeles* (2015) 237 Cal.App.4th 944, 965.)

We will consider each of the Board's arguments separately.

### A. *Software as "tangible personal property"*

The Board argues that the computer software in this case is tangible personal property, and offers the following syllogism in support of its position: (1) tangible personal property is property that "may be seen . . . or which is in any other manner perceptible to the senses" (§ 6016); (2) the act of placing data—in this case, AT&T/Lucent's software—on magnetic tapes and compact discs physically alters those tapes and discs; ergo, (3) the software can be (microscopically) seen and perceived by the senses, thereby rendering it tangible personal property.

We reject this syllogism for two reasons. First and foremost, it is inconsistent with precedent. As detailed above, when tangible and intangible property is inextricably intertwined, whether the property is subject to the sales tax turns on whether the tangible property is "essential" or "physically useful" to the subsequent use of the intangible

11

personal property. (*Preston*, *supra*, 25 Cal.4th at pp. 211-212; *Navistar*, *supra*, 8 Cal.4th at p. 878.) More to the point, the California courts have on multiple occasions held that the transmission of software using a tape or disc in conjunction with the grant of a license to copy or use that software does not yield a taxable transaction because the tape or disc is "merely . . . a convenient storage medium [used] to transfer [the] copyrighted content" and hence not in itself essential or physically useful to the later use of the intangible personal property. (*Microsoft*, *supra*, 212 Cal.App.4th at p. 92; accord, *Nortel*, *supra*, 191 Cal.App.4th at pp. 1275-1276 [noting that the buyer "made little use of the tangible disk containing the program, which was simply copied onto its computers"].) Critically, this is true even when—by definition—the use of the tape or disc to transmit the software necessarily puts content on the tape or disc and thereby alters its physical structure. By seeking to make the physical alteration of the storage media dispositive, the Board ignores this precedent.

Second, the Board's construction of section 6016 leads to an absurd result. Although we must evaluate the taxability of a transaction by what the taxpayer actually did rather than by what it could have done (*Wallace Berrie & Co. v. State Board of Equalization* (1985) 40 Cal.3d 60, 70), in construing a statute we are to avoid an interpretation that leads to absurd results (*Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 630). If we accepted the Board's construction of section 6016, AT&T/Lucent would be liable for nearly $25 million in sales tax because it decided to transmit its software to the telephone companies using tapes and discs, but would have been liable for *no* sales tax on the software if had instead transmitted the software electronically (via email or through uploading it to a remote server on the Internet for later download by the telephone companies) (Cal. Code Regs., tit. 18, § 1502, subd. (f)(1)(D) [sale of canned computer program not subject to sales tax if "transferred by remote telecommunications from the seller's place of business"]). Ascribing such tremendous consequences to the manner in which a software program is transmitted— when that manner is wholly collateral to the  subsequent use of the licenses regarding that software and when that manner is so easily manipulated by the buyer and seller—is an

12

absurd result nowhere sanctioned by the language of, or policy underlying, California's sales tax law.

The Board offers four further reasons in support of its position. First, it argues that two California cases—*Navistar*, *supra*, 8 Cal.4th 868 and *Touche Ross*, *supra*, 203 Cal.App.3d 1057—are consistent with its view that the sale of computer software on physical media is a transaction subject to the sales tax. However, both of these cases involved the sale of computer software "for its own sake" and not in conjunction with the concurrent sale of intellectual property rights. (*Navistar*, at pp. 877-878; *Touche Ross*, at pp. 1060-1064.) Neither case had occasion to consider the issue before us now—namely, whether the transmission of software through a physical media as a means of effectuating the grant of a license to copy and use that software is subject to the sales tax. As noted above, courts assess taxability in this context using a different rule than they use to assess taxability in the context at issue in *Navistar* and *Touche Ross*.

Second, the Board argues that sections 6010.9 and 6377.1, which create exceptions to the sales tax for certain types of transactions involving computer software, necessarily imply that all other transactions involving software are taxable; otherwise, the Board reasons, these two sections would be superfluous. We agree that we should generally avoid interpreting a statutory scheme in a way that renders any part of it superfluous (*City of Alhambra v. County of Los Angeles* (2012) 55 Cal.4th 707, 724), but the longstanding precedent we follow today does not render either section 6010.9 or section 6377.1 superfluous. Section 6010.9 excepts from the sales tax the service of creating a custom computer program, and section 6377.1 excepts from the sales tax the sale of equipment (including the software necessary to operate that equipment) that is purchased by entities using that equipment to stimulate economic development as part of California's enterprise zone program. (See Assem. Bill No. 93 (2013 Reg. Sess.) § 1.) Neither provision arises in the context of a concurrent transfer of inextricably intertwined intangible and tangible personal property, and consequently neither is rendered a nullity by our ruling today.

13

Third, the Board argues that Louisiana courts treat software as tangible property subject to Louisiana's sales tax. (*South Central Bell Tel. Co. v. Barthelemy* (La. 1994) 643 So.2d 1240, 1244 (*Barthelemy*).) As explained above, California law is different. Indeed, *Barthelemy* itself *distinguishes* California law on this very point. (*Ibid.*) Where out-of-state authority is at odds with California law, it lacks even persuasive value. (*Fairbanks v. Superior Court* (2009) 46 Cal.4th 56, 63.)

Lastly, the Board asks us to overturn the precedent that dictates a ruling against it. We are bound to follow the decisions of our Supreme Court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), but do have some latitude to disregard the decisions of our sister Courts of Appeal (and even our own prior decisions [*Roger Cleveland Golf Co., Inc. v. Crane & Smith* (2014) 225 Cal.App.4th 660, 677, overruled on other grounds by *Lee v. Hanley* (2015) 61 Cal.4th 1225]), although we only exercise that latitude when there is "good reason" to do so (*Bourhis v. Lord* (2013) 56 Cal.4th 320, 327). Courts are especially hesitant to overturn prior decisions where, as here, the issue is a statutory one that our Legislature has the power to alter. (Cf. *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 875.) Here, *Nortel's* analysis is largely governed by California Supreme Court precedent that binds us. Further, there is no good reason to revisit the remaining portions of *Nortel* because the interpretation the Board urges would, as noted above, lead to absurd results.

For these reasons, we conclude that the transmission of AT&T/Lucent's software using physical media as part of a transaction granting a license to copy and use that software did not transform that software into tangible personal property subject to the sales tax.

### B.    *Applicability of the technology transfer agreement statutes*

The Board alternatively contends that, even if AT&T/Lucent's computer software is not itself tangible personal property, the transactions between AT&T/Lucent and the telephone companies are still subject to the sales tax in their entirety because the contracts underlying them do not amount to technology transfer agreements and thus fall under the default "all-or-nothing" rule that, in the Board's view, subjects all of the

14

property sold or leased under the contracts to the sales tax. The unspoken premise of the Board's argument is that the switches, documentation, software, and licenses are all inextricably intertwined, and thus not subject to the rule that independently assesses taxability for each "readily separable" component of a transaction. It is far from clear that this premise is valid. We need not decide the validity of the premise because, even if we assume these components are inextricably intertwined, the transaction is still not subject to the sales tax in its entirety because the contracts between AT&T/Lucent and the telephone companies meet the statutory definition of technology transfer agreements.

As noted above, a technology transfer agreement is an agreement that satisfies three elements: (1) a person holds a patent or copyright; (2) that person assigns or licenses to another the right to make and sell a product or to use a process; and (3) the resulting product or process is subject to the assignor's or licensor's patent or copyright interest. (§§ 6011, subd. (c)(10)(D) & 6012, subd. (c)(10)(D).)

The first element is met because the undisputed evidence indicates that AT&T/Lucent's computer software was copyrighted and patented. (Accord, *Apple Computers, Inc. v. Formula International, Inc.* (9th Cir. 1984) 725 F.2d 521, 523-525, overruled on other grounds by *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.* (9th Cir. 2011) 654 F.3d 989 [computer programs may be copyrighted].) The Board argues that the AT&T/Lucent's evidence on this point was provided through the declarations of persons without personal knowledge, but these declarations specifically state to the contrary and the Board has forfeited its challenge to the trial court's decision to credit these assertions of personal knowledge by not supporting its challenge on appeal with legal authority (*People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 363-364). The Board further argues that AT&T/Lucent never established which *claim* within each of its patents the software embodied and offered only conclusory declarations that the software was copyright and patent-protected, yet these arguments are beside the point because there is no dispute that the software was a copyrighted work or that the software embodied some portion of AT&T/Lucent's patents. Nothing in sections 6011 or 6012 requires any greater granularity of proof than was established here. (Accord, *Preston*,

15

*supra*, 25 Cal.4th at p. 214 ["The absence of the word 'copyright' in most of the Agreements is irrelevant"].)

The second and third elements are also met. AT&T/Lucent transferred a portion of its copyright interest in its software when it granted the telephone companies a license to "reproduce [its] copyrighted work." (17 U.S.C. § 106(1); *MAI Systems Corp. v. Peak Computer, Inc.* (9th Cir. 1993) 991 F.2d 511, 518, overruled on other grounds by *eBay, Inc. v. MercExchange, LLC* (2006) 547 U.S. 388 ["loading copyrighted software into (a computer's random access memory or) RAM creates a 'copy' of that software in violation of the Copyright Act"].) The transfer of a single copyright right is sufficient. (*Preston*, *supra*, 25 Cal.4th at p. 214 ["Where the wording of the agreement clearly transfers *one of the rights or any subdivision of the rights* specified in title 17 United States Code section 106, a copyright transfer has occurred"], italics added; 17 U.S.C.S. § 201(d)(1) [allowing the rights attaching to a copyrighted work to be transferred "in whole or in part"].) The resulting products—the telephone products the telephone companies sold to their customers—were "subject to" this copyright interest. "[A] product is 'subject to' a copyright interest [citations], if the product is a copy of the protected expression or incorporates a copy of the protected expression." (*Preston*, at p. 215.) Without "incorporat[ing] a copy of" AT&T/Lucent's software, the switches could not route calls or data, or offer call waiting and other features, which are the very products the telephone companies were selling. AT&T/Lucent also transferred a portion of its patent rights when it granted the telephone companies licenses to use the processes embodied in its software, and the companies' resulting products—which, again, required the use of that software—were consequently "subject to" those patents. That is because "[t]he license of a patent interest . . . gives the licensee the right to make a product or use a process." (*Id.* at p. 216.)

Our prior decision in *Nortel* is exactly on point and came to the same conclusion. There, Nortel sold switches and licensed the software needed to operate them to a telephone company. The Board sought to assess the sales tax on the software that was transmitted to the telephone company using physical media. (*Nortel*, *supra*, 191

16

Cal.App.4th at pp. 1265-1267.) Indeed, as the trial court in this case observed, "One could almost substitute the names of the plaintiff and the monetary amounts, and the facts would be essentially the same." *Nortel* came to the conclusion that the entire transaction constituted a technology transfer agreement, and that the portion of the transaction dealing with the software and licenses to use it was not subject to the sales tax. (*Id.* at pp. 1269-1278.)

The Board nevertheless offers two reasons why we should reach a different result in this case. We consider each in turn.

### 1. Transfer of insufficient rights

The Board argues that a contract may qualify as a technology transfer agreement only if the manufacturer transfers "meaningful" copyright and patent rights, which the Board defines as "the right to mass-produce or sell downstream some patented or copyrighted item." In the Board's view, it is not enough if the license grants merely the rights "any customer would need in order to make conventional use of the associated tangible personal property."

We reject this argument for two reasons. First, it finds no support in the technology transfer agreement statutes, which refer simply to the assignment or licensing of "a patent or copyright interest." (§§ 6011, subd. (c)(10)(D) & 6012, subd. (c)(10)(D).) The requirement that the transferred intellectual property interest be "meaningful" or more than "conventional" appears nowhere in the text of the statute, and we are generally bound by a statute's plain text (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1369 (*Gutierrez*)), and "are not permitted to add words to a statute to accomplish a purpose . . . not apparent from the face of the statute." (*Community Development Com. v. County of Ventura* (2007) 152 Cal.App.4th 1470, 1483.) Second, the argument is inconsistent with federal copyright law, which provides that rights to a copyrighted work may be transferred piecemeal (17 U.S.C.S. § 201(d)(1)), and with our Supreme Court's pronouncement that a technology transfer agreement may be based upon the transfer of a single copyright right (*Preston*, *supra*, 25 Cal.4th at p. 214).

17

The Board offers six arguments as to why we should nonetheless adopt its position.  First, the Board argues that implying a requirement that the transfer of intellectual property rights be "meaningful" is necessary to assure that a technology transfer agreement—and the partial tax exemption that comes with it—is not based on a transfer of rights that is "completely lacking in substance."  This argument ignores that the technology transfer agreement statutes require a bona fide transfer of intellectual property rights.  That the requisite transfer need not be as sweeping as the Board might prefer does not mean that any less-sweeping transfer is a sham.

Second, the Board asserts that the technology transfer agreement statutes codified the decision in *Petition of Intel Corporation* (June 4, 1992) [1993-1995 Transfer Binder] Cal. Tax Rptr. (CCH) paragraph 402-675, page 27,873 (*Intel*).  Because *Intel* involved a transfer of intellectual property rights in anticipation of a mass production of software, the Board reasons, the statutes should be similarly limited.  Although the technology transfer agreement statutes surely sought to codify *Intel* (*Preston*, *supra*, 25 Cal.4th at p. 216), the statutes the Legislature enacted reflect *Intel*'s central holding—namely, that only the tangible portion of a concurrent transfer of tangible personal property and intangible copyright and patent rights is subject to the sales tax—but the statutes are not limited to *Intel's* factual context.  Indeed, the statutes' legislative history indicates that the Board warned the Legislature of how broadly the statutes could be construed, and the Legislature enacted the statutes anyway.  (*Nortel*, *supra*, 191 Cal.App.4th at p. 1269 ["The Legislature enacted the [technology transfer agreement] statutes over the Board's objections"].)

Third, and along the same lines, the Board argues that several cases applying the technology transfer agreement statutes—namely, *Preston*, *supra*, 25 Cal.4th 197, *Microsoft*, *supra*, 212 Cal.App.4th 78, and *Intel*, *supra*, [1993-1995 Transfer Binder] Cal.Tax Rptr. (CCH) P 402-675, p. 27,873—involved the transfers of copyright and/or patent interests in anticipation of mass production of products using that intellectual property, and that we must interpret the statutes in light of the "lessons" these cases teach.  But we are hesitant to engraft a limitation onto statutes that appears nowhere in

18

their text and which the Legislature declined to adopt simply because a handful of cases later applying the statutes happened to arise in a particular factual setting. We are especially loathe to do so when other cases have also applied the statutes in a setting that the suggested limitation would foreclose. (*Nortel*, *supra*, 191 Cal.App.4th at pp. 1269-1278.)

Fourth, the Board cites one of its regulations to support its position. To be sure, the regulation provides that a sales tax is properly assessed against the storage media and all license fees attendant to the sale or lease of a prewritten (or "canned") computer program unless the "license fees . . . are made for the right to reproduce or copy" a copyrighted program "in order for the program to be published and distributed for consideration to third parties." (Cal. Code Regs., tit. 18, § 1502, subds. (f)(1) & (f)(1)(B).) But this regulation must give way to the technology transfer agreement statutes in situations, as in this case, where they both may apply. (See *Yamaha Corp. of America v. State Board of Equalization* (1998) 19 Cal.4th 1, 16 (conc. opn. of Mosk, J.) ["""(N)o regulation adopted is valid or effective unless consistent and not in conflict with the statute"""], quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 748, italics omitted.)

Fifth, the Board urges us to follow the general interpretive maxim that tax statutes "'must be construed liberally in favor of the taxing authority, and strictly against [a] claimed exemption.'" (*Dicon Fiberoptics, Inc. v. Franchise Tax Board* (2012) 53 Cal.4th 1227, 1241, quoting *Hospital Service of California v. City of Oakland* (1972) 25 Cal.App.3d 402, 405.) An interpretive maxim is a helpful guide to use when a statute's language is ambiguous and the competing arguments on how to construe that statute are in equipoise; maxims cannot be used to trump a statute's plain text or to ignore binding precedent. (See *Butts v. Board of Trustees of California State University* (2014) 225 Cal.App.4th 825, 838 ["If the plain language of a statute . . . is clear and unambiguous, . . . there is no need to resort to the canons of construction or extrinsic aids to interpretation"].)

Lastly, the Board asks us to overrule *Nortel*. However, *Nortel* is not the only decision standing between the Board and the result it wants: The principle that the

transfer of a single right can underlie a valid technology transfer agreement comes from the federal copyright statutes and our Supreme Court's decision in *Preston*, *supra*, 25 Cal.4th 197, authority we are not at liberty to disregard. Further, the Board gives us no good reason to depart from this authority, even if we could.

### 2. Failure to refute all possible copyright and patent defenses

The Board further contends that a product or process is "subject to" a copyright or patent—and that a contract transferring such rights may qualify as a technology transfer agreement—only if, without the license granted in the contract, the licensee would have infringed the copyright or patent. Put differently, the Board urges that the technology transfer agreement statutes are inapplicable unless and until the taxpayer makes "a prima facie showing that it was more likely than not that, absent the right-to-use licenses in the agreements, [its] customers would have infringed on [the taxpayer's] patent or copyright interests when using the acquired software." Any lesser showing, the Board implies, would turn any contract into a technology transfer agreement merely because "the taxpayer says so."

We decline to engraft such a requirement onto the technology transfer agreement statutes for several reasons. First and foremost, a defeat-every-possible-copyright-and-patent-defense requirement appears nowhere in the text of the statutes. Second, and as noted above, such a requirement is flatly inconsistent with our Supreme Court's holding that the licensee's product is "subject to" a copyright interest when that product "is a copy . . . or incorporates a copy of the" copyrighted work, and is "subject to" a patent when that product is made "us[ing]" the patented process. (*Preston*, *supra*, 25 Cal.4th at pp. 215-216.) The requirements set forth in *Preston* are not a meaningless formality.

Third, the Board's interpretation would, for all intents and purposes, foreclose any use of the technology transfer agreement statutes. The Board suggests that AT&T/Lucent has not met the Board's proffered new standard because AT&T/Lucent did not refute the possible copyright defenses of implied license to make a single copy of computer programs (17 U.S.C.S. § 117(a)); of implied oral license (*Effects Assocs. v. Cohen* (9th Cir. 1990) 908 F.2d 555, 558); of equitable estoppel (*Hadady Corp. v. Dean Witter*

20

*Reynolds, Inc.* (C.D.Cal. 1990) 739 F.Supp. 1392, 1399-1400); of exhaustion (*Morrissey v. Proctor & Gamble Co.* (1st Cir. 1967) 379 F.2d 675, 678-679); of the uncopyrightability of ideas and processes (*Lotus Dev. Corp. v. Borland International* (1st Cir. 1995) 49 F.3d 807, 815; 17 U.S.C. § 102(b)); and of fair use (17 U.S.C.S. § 117) and the patent defenses of exhaustion (*Quanta Computer, Inc. v. LG Electronics* (2008) 553 U.S. 617, 638); of implied license (*Zenith Electronics Corp. v. PDI Commun. Sys.* (Fed.Cir. 2008) 522 F.3d 1348, 1360); and of equitable estoppel (*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.* (Fed.Cir. 1992) 960 F.2d 1020, 1028, overruled on other grounds by *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC* (Fed.Cir. 2015) 2015 U.S.App. Lexis 16621). The Board has not adduced any evidence that these defenses might be at issue in this case; if no evidentiary showing is required, as the Board's argument suggests, then the defenses a taxpayer would have to refute are limited only by the Board's ingenuity and imagination. This is a profoundly unsound result. It would turn every taxpayer refund action involving the technology transfer agreement statutes into a full-blown copyright and/or patent trial. Further, because it would obligate the taxpayer—who by statute bears the burden of establishing its entitlement to a tax exemption (§ 6091)—to refute every possible copyright and patent defense, the Board's interpretation would effectively nullify those statutes. This is a result we cannot countenance. (*Gutierrez*, *supra*, 58 Cal.4th at p. 1369 [we interpret statutes "with a view to promoting rather than defeating the[ir] general purpose"]; see also *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 286 [declining to adopt an interpretation of a statute because "it would require [a party] to identify and address every conceivable statute that might have had some bearing . . . and then prove a negative"].)

We consequently conclude that the contracts between AT&T/Lucent and the telephone companies qualify as technology transfer agreements.

### C. *Proof of value of tangible personal property*

The Board finally asserts that, even if AT&T/Lucent's contracts are technology transfer agreements, the tangible personal property component of those agreements—the portion subject to the sales tax—was incorrectly calculated. As noted above, a taxpayer

21

who transfers tangible personal property along with copyright or patent interests under a technology transfer agreement remains liable to pay the sales tax on the tangible personal property portion of the transfer. (§§ 6011, subd. (c)(10)(A) & 6012, subd. (c)(10)(A).) That tangible personal property is to be valued in one of three ways: (1) by the price stated in the technology transfer agreement itself; (2) by the price at which "the tangible personal property or like tangible personal property has been previously sold or leased . . . to third parties"; or (3) 200 percent of the cost of materials and labor used to produce the tangible personal property. (§§ 6011, subd. (c)(10) & 6012, subd. (c)(10).) The trial court held that AT&T/Lucent was liable to pay the sales tax on the retail value of the switches, of the instructions, and of the *blank* tapes and compact discs used to transmit its software; because only four of AT&T/Lucent's contracts listed a price for the blank media, the court looked primarily to the price that AT&T/Lucent had charged third parties for blank media. The Board contends that this was wrong because blank media is not "like" the tapes and discs that actually contained AT&T/Lucent's software. What is more, because AT&T/Lucent did not keep records of its research and development costs for the software, AT&T/Lucent cannot avail itself of the final valuation method that looks to 200 percent of development costs and must therefore be required to pay the sales tax on the entire transaction.

We are unpersuaded. The Board's argument is little more than a variation on an argument we have already rejected. As we conclude above, the fact that placing a computer program on storage media physically alters that media does not thereby transmogrify the software itself into tangible personal property; the media is tangible, the software is not. Thus, the price of *blank* media is the price of the tangible personal property, and is what is to be taxed under the technology transfer agreement statutes.[6]

---

[6] In light of this conclusion, we have no occasion to reach the Board's alternative arguments that AT&T/Lucent's failure to restructure its internal accounting procedures to track the costs of developing software is a necessary prerequisite to invocation of the technology transfer agreement statutes.

22

## III.    Reasonable Litigation Costs

The Board lastly argues that the trial court erred in requiring it to pay $2,625,469.87 in AT&T/Lucent's "reasonable litigation costs." Section 7156 empowers a trial court to award the party who "substantially prevailed" in a tax proceeding, including one involving the Board, all of its "reasonable litigation costs" if the Board's "position . . . was not substantially justified." (§ 7156, subds. (a), (c)(2) & (f).) These costs include expert witness fees, the cost of necessary studies, and reasonable attorney's fees. (*Id.*, subd. (c)(1)(B).) On appeal, the Board does not dispute the amount of the award, but contends that its position was substantially justified. This is a question we review for an abuse of discretion. (*Agnew v. State Board of Equalization* (2005) 134 Cal.App.4th 899, 909 (*Agnew*).)

The trial court did not abuse its discretion in finding that the Board's position was not "substantially justified." A litigant's position is "substantially justified" if it is "'"justified to a degree that would satisfy a reasonable person, or '"has a '"reasonable basis both in law and fact.'"'"'"'" (*Agnew*, *supra*, 134 Cal.App.4th at p. 909; *Wertin v. Franchise Tax Board* (1998) 68 Cal.App.4th 961, 977 (*Wertin*).)

In this case, each of the Board's primary arguments was foreclosed by existing precedent, much of which comes from our Supreme Court. The Board's arguments that placing computer software onto physical media turns the software itself into tangible personal property and that the taxable basis includes the software are irreconcilable with the rationales of *Preston*, *supra*, 25 Cal.4th at pages 211-212 and *Navistar*, *supra*, 8 Cal.4th at page 878, and with the specific holdings of *Microsoft*, *supra*, 212 Cal.App.4th at page 82 and *Nortel*, *supra*, 191 Cal.App.4th at pages 1275-1276. And the Board's argument that the technology transfer agreement statutes do not apply is inconsistent with federal copyright law, with *Preston*, at page 214, and with our factually and legally indistinguishable decision in *Nortel*.

The Board offers two arguments in response. First, the Board asserts that *Nortel* did not address any issue the Board raises in this case. The Board is wrong. To begin, *Nortel* explicitly decided whether an agreement factually identical to the agreements at

issue here was a technology transfer agreement.  To be sure, *Nortel* did not expressly confront the logically antecedent question of the tangibility of computer software.  But *Nortel's* entire *raison d'être*—deciding the taxability of software transmitted using physical media under the technology transfer agreement statutes—would have been wholly academic if, as the Board contends, the software was itself tangible because the statutes do not apply to a transfer of wholly tangible personal property.  (See *People v. Herrera* (2006) 136 Cal.App.4th 1191, 1198 [courts do not decide "abstract or academic questions of law"].)  In any event, *Nortel's* analysis was largely dictated by precedent from our Supreme Court and by federal copyright law, sources of law we are obligated to follow.

Second, the Board evokes a watered-down version of the argument it made to the trial court—namely, that a government litigator should be entitled to more than "one-bite-at-the-apple" and should not too quickly be "forced to adopt legal results that are inconsistent with its own understanding of the law" because the government has a special interest in ensuring "an accurate interpretation and application of the laws" notwithstanding precedent to the contrary.  For support, the Board cites *Pierce v. Underwood* (1987) 487 U.S. 552, 569 (*Pierce*).  However, *Pierce upheld* a trial court's finding that a government litigant's position was not "substantially justified" under the analogous Equal Access to Justice Act.  (28 U.S.C.S. § 2412; *Wertin*, *supra*, 68 Cal.App.4th at pp. 977-978 [looking to the Equal Access to Justice Act in interpreting section 7156].)  *Pierce* did note that "the fact that one other court agreed or disagreed with the Government does not establish whether its position was substantially justified." (*Pierce*, at p. 569.)  But the Board's position in this case, as noted above, was not inconsistent with *Nortel* alone; it was also inconsistent with the whole cloth of California Supreme Court precedent that informed *Nortel* as well as with federal copyright law.

The Board's conduct in this litigation falls squarely within the heartland of section 7156, and the core purposes of the Taxpayer's Bill of Rights of which it is the key part—namely, to "deter[] state[] agents from asserting unreasonable and unfair claims and defenses against private citizens" and thus to "preserve[] the balance between legitimate

24

revenue collection and 'government oppression.'" (*Garg v. People ex rel. State Board of Equalization* (1997) 53 Cal.App.4th 199, 208.) The position the Board took in this case had been rejected by the Legislature that enacted the technology transfer agreement statutes, rejected by several courts interpreting those statutes, and specifically rejected by *Nortel*. Yet the Board continued to oppose AT&T/Lucent's refund action, countersued for more than $18 million (and ultimately agreed to accept less than $2 million), propounded thousands of discovery requests, and generated a 20,000 page record on appeal. The net result is that AT&T/Lucent incurred more than $2.5 million in litigation costs to receive a tax refund to which it was indisputably entitled under controlling law. It is certainly up to the Board to decide whether to take positions at odds with binding, on-point authority, but section 7156 makes clear that the Board is not free to require taxpayers to bear the cost of a litigation strategy aimed at taking a third, fourth, or fifth bite at the apple.

The trial court properly awarded AT&T/Lucent its "reasonable litigation costs."

## DISPOSITION

The judgment is affirmed. AT&T/Lucent is entitled to its costs on appeal.

## <u>CERTIFIED FOR PUBLICATION</u>.

_____, J.
HOFFSTADT

We concur:

_____, Acting P.J.
ASHMANN-GERST

_____, J.
CHAVEZ